IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

\* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| SAN JUAN COUNTY, UTAH, a Utah political subdivision, | ) ) ) | Civil No. 2:04-CV-0552BSJ |
| Plaintiff, | ) ) | |
| STATE OF UTAH, | ) ) | **FINDINGS OF FACT, MEMORANDUM OPINION & ORDER** |
| Intervenor-Plaintiff, | ) ) | |
| vs. | ) ) | |
| UNITED STATES OF AMERICA, DEPARTMENT OF THE INTERIOR, NATIONAL PARK SERVICE, | ) ) ) ) | |
| Defendants. | ) | |

<table>
<tr><td>

**FILED**

CLERK, U.S. DISTRICT COURT

May 27, 2011 (12:04pm)

DISTRICT OF UTAH

</td></tr>
</table>

\* \* \* \* \* \* \* \* \*

   *A mammoth stone angel with folded wings leans against the buttress of a gigantic arch that is free-standing on the brink of a canyon. Desert-varnished walls form the rear flank.*[1]

   *[T]his arch has inspired several descriptions. Some have called it "Pegasus," inspired by the ancient Greek myth of the flying horse. Chaffee C. Young named it "Angel Arch," seeing in stone a heavenly messenger. Most now see it that way, and understandably are awed and even reverential in the presence of its majesty. A tremendous angel, great wings folded to the back, head bowed in prayer or meditation, seems to lean against a supportive arch . . . atop a steep, salmon-pink cliff.*[2]

---

   [1]Raye Carlson Price, *Guidebook to Canyonlands Country* 79 (1974).

   [2]Lynn Arave & Ray Boren, "Angel Arch: Pictographs and a 'Potty' Greet Visitors on a Bumpy Ride into Canyonlands' Back Country," *Deseret News*, Oct. 29, 1995; *see also* John W. Van Cott, *Utah Place Names: a Comprehensive Guide to the Origins of Geographic Names* 8 (1990).



One of Canyonlands National Park's premiere geological attractions, Angel Arch is yet "considered by many people to be the most beautiful and spectacular arch in the park if not in the entire canyon country."[3] At the time the Park was created in 1964, Congress acknowledged that "Angel Arch in Salt Creek Canyon is incomparable." H.R. Rep. No. 1823, 88th Cong., 2nd Sess., at 6 (1964), *reprinted in* 1964 U.S.C.C.A.N. 3718, 3719; S. Rep. No. 381, 88th Cong., 1st Sess., at 6 (1963) (same).

This case concerns motor vehicle access to Angel Arch and its environs by visitors to Canyonlands National Park. Plaintiffs San Juan County and the State of Utah contend that a

---

[3]S.W. Lohman, *The Geologic Story of Canyonlands National Park* 68 (Geol. Surv. Bull. 1327, 1974), *available at* http://www.cr.nps.gov/history/online_books/geology/publications/bul/1327/contents.htm.

historical R.S. 2477[4] public highway right-of-way along Salt Creek guarantees public access to Angel Arch using at least a limited number of four-wheel-drive motor vehicles. The federal defendants dispute this assertion, arguing that no such right-of-way vested in the public under R.S. 2477 prior to the creation of Canyonlands National Park in 1964, and that since the Park was created, vehicle access to Angel Arch has been governed as a matter of National Park Service policy, including the agency's 2004 decision to close Salt Creek Canyon to motor vehicle access beyond a gate placed on the trail near Peekaboo Spring, roughly 8.8 miles below Angel Arch itself. The federal defendants also argue that the plaintiffs' right-of-way claim runs afoul of the twelve-year statute of limitations under the federal Quiet Title Act; thus, the above-captioned action is time-barred and this court need not reach the merits. Plaintiffs respond that the commencement of this action in 2004 fell well within the Act's twelve-year window.

Resolution of the right-of-way issue turns upon matters of legal interpretation and historical fact.

Beginning September 14, 2009, this case was tried to the court for nine days. The court heard testimony, received numerous exhibits, and conducted a site visit at Canyonlands National Park on October 6, 2009. The court heard closing arguments on October 9, 2009, and took the matter under advisement. Having reviewed and considered the evidence presented, including the

---

[4]Revised Statutes (R.S.) § 2477, Act of June 26, 1866, ch. 262, § 8, 14 Stat. 251, *codified as amended at* 43 U.S.C. § 932 (1970) (repealed in 1976 by the Federal Land Policy and Management Act of 1976 ("FLPMA"), Public Law 94-579, § 706(a), 90 Stat. 2744, 2793 (1976)). Although FLPMA repealed R.S. 2477, it expressly preserved any existing rights-of-way. *See* Pub.L. No. 94-579, § 701(a), 90 Stat. 2743, 2786 ("Nothing in this Act . . . shall be construed as terminating any valid lease, permit, patent, right-of-way, or other land use right or authorization existing on the date of approval of this act."); *id.* at § 701(h), 90 Stat. 2743, 2786 ("All actions by the Secretary concerned under this Act shall be subject to valid existing rights.").

firsthand observation of the site by court and counsel, and having reviewed and considered the arguments of counsel, the briefs submitted and the pertinent legal authorities, this court now rules on the various factual and legal questions presented at trial.

## JURISDICTION & VENUE

This is a civil action to quiet title to a public highway right-of-way pursuant to the Quiet Title Act, 28 U.S.C. § 2409a, invoking the subject matter jurisdiction of the court under 28 U.S.C. §1346(f). Venue is proper pursuant to 28 U.S.C. § 1391(e)(2) in that the claimed property interest at issue is located within the State of Utah, and lies in the Central Division of the District of Utah because the claimed property interest at issue is located in San Juan County, Utah. *See* 28 U.S.C. § 125(2).

## R.S. 2477 RIGHTS-OF-WAY: THE INTERPRETIVE FRAMEWORK

### History of the Statute

The history of R.S. 2477 has itself become a well-trodden path:

"In 1866, Congress passed an open-ended grant of 'the right of way for the construction of highways over public lands, not reserved for public uses.'" *S. Utah Wilderness Alliance v. Bureau of Land Mgmt.*, 425 F.3d 735, 740 (10th Cir. 2005) (quoting Act of July 26, 1866, ch. 262, § 8, 14 Stat. 251, 253, *codified at* 43 U.S.C. § 932, *repealed by* Federal Land Policy Management Act of 1976 (FLPMA), Pub.L. No. 94-579 § 706(a), 90 Stat. 2743). "This statute, commonly called 'R. S. 2477,' remained in effect for 110 years, and most of the transportation routes of the West were established under its authority." *Id.* "In 1976, however, Congress abandoned its prior approach to public lands and instituted a preference for retention of the lands in federal ownership, with an increased emphasis on conservation and preservation." *Id.* at 741. "As part of that statutory sea change, Congress repealed R.S. 2477." *Id.* "There could be no new R.S. 2477 rights of way after 1976." *Id.* "But even as Congress repealed R.S. 2477, it specified that any 'valid' R.S. 2477 rights of way 'existing on the date of approval of th[e] [FLPMA]' (October 21, 1976) would continue in effect." *Id.* (quoting Pub.L. No. 94-579 § 701(a), 90 Stat. 2743, 2786 (1976)). Congress also directed that "[a]ll actions [taken] by the Secretary concerned under this Act

-4-

[the FLPMA] shall be subject to valid existing rights." 43 U.S.C. § 1701 historical note (h).

*Kane County, Utah v. Salazar*, 562 F.3d 1077, 1079 (10th Cir. 2009).

"There is no legislative history that sheds light on why Congress included the highway grant as section 8 in the Mining Act of 1866 . . . or on exactly what Congress intended by the language of the section. . . . The principal focus of the floor debates on the Act was on alternatives for disposing of the mineral lands of the United States, and section 8 was not discussed." Pamela Baldwin, *Highway Rights of Way on Public Lands: R.S. 2477 and Disclaimers of Interest* (Congressional Research Service Report for Congress, Order Code RL32142) 26 (Nov. 7, 2003) (footnote omitted); *see id.* at 26 n.98 (summarizing legislative history of 1866 Act). "Therefore, in seeking clarification of the intent of Congress in enacting R.S. 2477, we must look primarily to the words Congress actually used and to the historical context in which they were enacted." *Id.* at 27.

> The Mining Act of 1866 established a system for the recognition of several practices that had been taking place on public domain lands. Some of the provisions directly addressed mining, other provisions related to the use of water and to rights of way. These latter provisions addressed practices that were related to mining, but had implications beyond the mining context. The Act legitimized mining claims in accordance with federal laws or regulations, state and local law, and even the local customs of miners, and provided that claimants could obtain full title to the lands on which mining claims were located. Because water was necessary for some types of mining, the Act acknowledged rights to use water, if such rights were recognized by local customs, laws, and the decisions of courts, and § 9 of the 1866 act also addressed construction of rights of way for ditches for the transport of water.

*Id.* at 26. The creation of roads and ensuring access to mining claims, homesteads, and other private interests "were fundamental problems implicit in the surveying system the federal government used to divide and dispose of public lands." *Id.* at 27. In enacting § 8 of the 1866

Act,

> Congress did not resolve the issue, choosing instead to acquiesce in whatever access solutions developed on unreserved federal lands. Access problems typically were resolved among settlers as the local topography and circumstances indicated; usually, settlers simply created roads and ways across lands as needed. Subsequent settlers took title subject to established roads and ways. . . .

*Id.* at 27-28 (footnote omitted).

"Although the cryptic language and sparse legislative history of R.S. 2477 leave Congress's exact purpose somewhat obscure, R.S. 2477 is now generally accepted to embrace Congress's policies both to promote orderly future settlement and to legitimize the occupancy of settlers whose presence had outpaced the law." Birdsong, Bret C., *Road Rage and R.S. 2477: Judicial and Administrative Responsibility for Resolving Road Claims on Public Land*, 56 Hastings L.J. 523, 527 (2005).[5] The Supreme Court has observed that R.S. 2477 was enacted to

---

[5]

> Though there is no legislative history on the statute's intent, it is commonly understood that R.S. 2477 was an offer from the federal government to the individual states and territories to legitimize existent miners' and homesteader's access routes that had developed across the public domain during the expansion of the western frontier. In so doing, R.S. 2477 provided for the continued establishment of roads that would foster future resource development across the vast expanse of western lands owned by the federal government.
> . . . .
> While the federal government was preoccupied with the issues of slavery and secession in the years preceding the mining laws, homesteaders and miners were left to their own devices in developing access to claims and farms. Not until after the Civil War did Congress once again turn its attention to the nation's internal economic development. Recognizing path and road developments that had already evolved in the remote territories, Congress decided to formalize and solidify these access routes, thereby validating the frontier policy of self-help development.

Harry R. Bader, *Potential Legal Standards for Resolving the R.S. 2477 Right of Way Crisis*, 11 Pace Envtl. L. Rev. 485, 486-87, 489 (1994) (footnote omitted).

encourage roads as "necessary aids to the development and disposition of the public lands," recognizing that their maintenance was "clearly in furtherance of the general policies of the United States." *Central Pac. Ry. v. Alameda County*, 284 U.S. 463, 472–73 (1931).

> Congress's goal—to grant free and easy access to and across federal lands—is exemplified in the self-executing way R.S. 2477 was implemented by federal land-management agencies. Early federal regulations addressing R.S. 2477 stated: "This grant becomes effective upon the construction or establishing of highways, in accordance with the State laws, over public lands not reserved for public uses. No application should be filed under this act, as no action on the part of the Federal Government is necessary."

Matthew L. Squires, *Federal Regulation of R.S. 2477 Rights-of-Way*, 63 NYU Ann. Surv. of Am. L. 547, 558 (2008) (footnote omitted) (quoting *Regulations Governing Rights-of-Way for Canals, Ditches, Reservoirs,Water Pipe Lines, Telephone and Telegraph Lines, Tramroads, Roads and Highways, Oil and Gas Pipe Lines, Etc.*, 56 I.D. 533, 551 (1938)).[6]

**What Makes a Highway?**

As the court of appeals explained in its prior opinion in this case:

> R.S. 2477 provided for "right[s]-of-way for the construction of highways over public lands, not reserved for public uses." An Act Granting the Right of Way to Ditch and Canal Owners over the Public Lands, and for Other Purposes, Ch. CCLXII § 8, 14 Stat. 251, 253 (1866). This statute reflected a "congressional policy promot[ing] the development of the unreserved public lands and their

---

[6]These early federal regulations were published in the *Federal Register* and the *Code of Federal Regulations* (C.F.R.). See *Rights of Way for Roads and Highways over Public Land*, 3 Fed. Reg. 1035, 1041 (June 1, 1938) (*codified at* 43 C.F.R. § 244.55 (1938) ("This grant becomes effective upon the construction or establishment of highways, in accordance with the State laws, over public lands not reserved for public uses. No application should be filed under the act, as no action on the part of the Federal Government is necessary."); *see* 43 C.F.R. § 244.58 (1963) (same). As recently as 1975, these federal regulations provided that "[g]rants of right-of-way [under R.S. 2477] become effective upon the construction or establishment of highways, in accordance with the State laws, over public lands, not reserved for public uses." 43 C.F.R. §§ 2822.1-1, 2822.2-1 (1974).

passage into private productive hands," *S. Utah Wilderness Alliance v. Bureau of Land Mgmt.*, 425 F.3d 735, 740 (10th Cir. 2005), by making "a standing offer of a free right of way over the public domain," *id.* at 741 (internal quotation marks omitted). *See generally* Harry R. Bader, *Potential Legal Standards for Resolving the R.S. 2477 Right of Way Crisis*, 11 Pace Envtl. L. Rev. 485 (1994).

*San Juan County, Utah v. United States*, 503 F.3d 1163, 1167-68 (10th Cir. 2007) (en banc).

Controversies such as this one often arise because

[t]he establishment of these rights of way "required no administrative formalities: no entry, no application, no license, no patent, and no deed on the federal side; no formal act of public acceptance on the part of the states or localities in whom the right was vested." . . . Indeed, "R.S. 2477 was a standing offer of a free right of way over the public domain," the acceptance of which occurred "without formal action by public authorities." . . . "All that is required" for title to pass "are acts on the part of the grantee sufficient to manifest an intent to accept the congressional offer." . . .

*The Wilderness Society v. Kane County, Utah*, 632 F.3d 1162, 1165 (10th Cir. 2011) (en banc)

(citations omitted) (quoting *Southern Utah Wilderness Alliance v. BLM*, 425 F.3d 735, 741, 754

(10th Cir. 2005)); *see also* U.S. Dept. of Interior, *Report to Congress on R.S. 2477: The History*

*and Management of R.S. 2477 Rights–of–Way Claims on Federal and Other Lands* 1 (June 1993)

(R.S. 2477 highways "were constructed without any approval from the federal government and

with no documentation of the public land records, so there are few official records documenting

the right-of-way or indicating that a highway was constructed on federal land under this

authority.")

To guide the resolution of R.S. 2477 disputes, the Tenth Circuit propounded the current

interpretive framework and explained its legal and historical footing in *Southern Utah*

*Wilderness Alliance v. BLM*, 425 F.3d 735, 741, 761-84 (10th Cir. 2005) ("*SUWA*").

To begin with, "federal law governs the interpretation of R.S. 2477," but "in determining

what is required for acceptance of a right of way under the statute, federal law 'borrows' from long-established principles of state law, to the extent that state law provides convenient and appropriate principles for effectuating congressional intent." *Id.* at 768.[7] In *SUWA*—and in this case—the state law to be "borrowed" is "that of the State of Utah, supplemented where appropriate by precedent from other states with similar principles of law." *Id.* As *SUWA* noted, the pertinent Utah statute is Utah Code Ann. § 27–12–89 (1953) (*current version codified at Utah Code Ann. § 72–5–104(1) (2005)*), which provides that "[a] highway shall be deemed to have been dedicated and abandoned to the use of the public when it has been continuously used as a public thoroughfare for a period of ten years."

> The Utah Supreme Court held a nearly identical earlier version of this statute applicable to R.S. 2477 claims in *Lindsay Land & Live Stock Co. v. Churnos*, 75 Utah 384, 285 P. 646, 648 (1929), relying on Laws of Utah 1886, ch. 12, § 2 ("A highway shall be deemed and taken as dedicated and abandoned to the use of the Public when it has been continuously and uninterruptedly used as a Public thoroughfare for a period of ten years.").

*SUWA*, 425 F.3d at 768 n.19.

The burden of proof to establish the existence of an R.S. 2477 right-of-way falls squarely

---

[7]As the Tenth Circuit previously explained:

There is no legislative history to R.S. 2477, and the legislative context of R.S. 2477 sheds little light. R.S. 2477 was originally enacted as section 8 of the Act of July 26, 1866. Congress explicitly adopted state or local law as the rule of decision for sections 1, 2, 5 and 9 of the 1866 Act; just as explicitly, Congress asserted the applicability of federal laws or regulations in sections 7, 10, and 11. The silence of section 8 reflects the probable fact that Congress simply did not decide which sovereign's law should apply.

*Sierra Club v. Hodel*, 848 F.2d 1068, 1080 (10th Cir. 1988), *overruled in part on other grounds by Village of Los Ranchos de Albuquerque v. Marsh*, 956 F.2d 970, 973 (10th Cir. 1992) (en banc).

upon the claimants who seek to enforce rights-of-way against the United States. *Id.*[8] Under

federal law, "the established rule [is] that land grants are construed favorably to the Government,

that nothing passes except what is conveyed in clear language, and that if there are doubts they

are resolved for the Government, not against it." *Watt v. Western Nuclear, Inc.*, 462 U.S. 36, 59

(1983) (quoting *United States v. Union Pacific R.R. Co.*, 353 U.S. 112, 116 (1957)).

> Other courts have applied this rule to R.S. 2477 cases, *Adams v. United States*, 3
> F.3d 1254, 1258 (9th Cir. 1993); *United States v. Balliet*, 133 F.Supp.2d 1120,
> 1129 (W.D. Ark. 2001); *Fitzgerald v. United States*, 932 F. Supp. 1195, 1201 (D.
> Ariz. 1996), and we agree. On remand, therefore, the Counties, as the parties
> claiming R.S. 2477 rights, bear the burden of proof.

*SUWA*, 425 F.3d at 769.[9]

Utah appellate courts have noted that because "the ownership of property should be

granted a high degree of sanctity and respect," *Draper City v. Bernardo*, 888 P.2d 1097, 1099

(Utah 1995), "dedication of property to public use should not be lightly presumed," *Thurman v.*

---

[8]As *SUWA* observed, "Under Utah law determining when a highway is deemed to be
dedicated to the use of the public, '[t]he presumption is in favor of the property owner; and the
burden of establishing public use for the required period of time is on those claiming it.'" 425
F.3d at 768 (footnote omitted) (quoting *Leo M. Bertagnole, Inc. v. Pine Meadow Ranches*, 639
P.2d 211, 213 (Utah 1981)).

[9]It appears that in 2003 the Utah Legislature attempted to alter the burden of proof
concerning the acceptance of R.S. 2477 rights-of-way, creating a presumption in favor of right-
of-way existence where "the state or a political subdivision of the state makes a finding that the
highway was constructed and the right-of-way was accepted prior to October 21, 1976." Utah
Code Ann. § 72-5-302(3)(a). Not having been formulated until many years after the opportunity
to accept the R.S. 2477 grant had been terminated by Congress, this *post hoc* presumption cannot
serve to satisfy the plaintiffs' burden of proof in this case. Whether the R.S. 2477 grant has been
accepted "is a question of compliance with the then-existing laws of the state where the
right-of-way was established." Barbara Hjelle, *Reply to Mr. Lockhart: an Explanation of R.S.
2477 Precedent*, 14 J. Energy Nat. Resources & Envtl. L. 349, 349 (1994); *see SUWA*, 425 F.3d
at 771 ("Looking to the Utah statutes in force at the time the right of way was claimed to have
been accepted, . . .").

*Byram*, 626 P.2d 447, 448 (Utah 1981).  In consideration of this policy, the Utah Supreme Court has placed the burden of proving the existence of a public road by clear and convincing evidence on the party seeking to establish the dedication.  *See Draper City*, 888 P.2d at 1099 ("This higher standard of proof is demanded since the ownership of property should be granted a high degree of sanctity and respect.") (citing *Thomson v. Condas*, 27 Utah 2d 129, 130, 493 P.2d 639, 639 (1972); *Petersen v. Combe*, 20 Utah 2d 376, 377-78, 438 P.2d 545, 548 (1968)); *see Wasatch County v. Okelberry*, 2008 UT 10, ¶ 9, 179 P.3d 768, 773 (reaffirming that "a party seeking to establish dedication and abandonment under [Utah Code Ann. § 72-5-104(1)] bears the burden of doing so by clear and convincing evidence").  Having borrowed the Utah law standard in determining what is required for public acceptance of the grant of a right-of-way under R.S. 2477, we likewise borrow the corresponding Utah law standard of proof: *clear and convincing evidence*.

R.S. 2477 having been uniformly construed by the courts as an express dedication of public land for rights-of-way by the Congress, absent some deliberate action on the part of State or local government,[10] the existence of a right-of-way depends upon the acceptance of that dedication by the public.  "The standard for acceptance of an R.S. 2477 right of way in Utah is 'continued use of the road by the public for such length of time and under such circumstances as to clearly indicate an intention on the part of the public to accept the grant.'"  *SUWA*, 425 F.3d at 781 (quoting *Lindsay Land & Live Stock Co. v. Churnos*, 75 Utah 384, 285 P. 646, 648 (1929)).  Acceptance of an R.S. 2477 right-of-way in Utah "requires continuous public use for a period of

---

[10]*See, e.g.*, *Memmott v. Anderson*, 642 P.2d 750, 753 (Utah 1982) (ruling that the R.S. 2477 "offer was accepted by Millard County by building the road," which had been "constructed in 1961"on "federal public land").

ten years.  The question then becomes how continuous and intensive the public use must be.  The decisions make clear that occasional or desultory use is not sufficient." *Id.* at 771.  Nor does use for a limited purpose or limited time suffice.  The *SUWA* panel noted that "[l]arge parts of southern Utah are crisscrossed by old mining and logging roads constructed for a particular purpose and used for a limited period of time, but not by the general public." *Id.* at 781-82.

Acceptance of the grant referred to in R.S. 2477 generally "became effective upon the construction or establishing of highways, in accordance with the state laws." *Sierra Club v. Hodel*, 848 F.2d at 1078 (citations, brackets, and internal quotation marks omitted).

> At common law the term "highway" was a broad term encompassing all sorts of rights of way for public travel.  In his magisterial Commentaries on American Law, Chancellor James Kent wrote that "Every thoroughfare which is used by the public, and is, in the language of the English books, 'common to all the king's subjects,' is a highway, whether it be a carriage-way, a horse-way, a foot-way, or a navigable river." James Kent, 3 *Commentaries on American Law* 572–73, *432 (10th ed. 1860).  Accord, Isaac Grant Thompson, *A Practical Treatise on the Law of Highways* 1 (1868) ("A highway is a way over which the public at large have a right of passage, whether it be a carriage way, a horse way, a foot way, or a navigable river"); Joseph K. Angell & Thomas Durfee, *A Treatise on the Law of Highways* 3–4 (2d ed. 1868) ("Highways are of various kinds, according to the state of civilization and wealth of the country through which they are constructed, and according to the nature and extent of the traffic to be carried on upon them, —from the rude paths of the aboriginal people, carried in direct lines over the natural surface of the country, passable only by passengers or pack-horses, to the comparatively perfect modern thoroughfare.").

425 F.3d at 782.[11]

_____

[11]The Congressional Research Service has examined the meaning of "highway" in the historical context of R.S. 2477 in some detail:

> Like many words in the English language, the term "highway" has more than one meaning; unfortunately, two of its meanings have somewhat opposite connotations, as can be demonstrated from numerous treatises and other sources.  One of the principal definitions of the term is a generic one meaning any avenue

(continued...)

*SUWA* points to an oft-quoted 1902 administrative opinion in which a "highway" was

described as "a road over which the public at large have a right of passage and includes every

[11](...continued)
of travel open to the public, including rivers and bridges.  Congress has used the term in this sense when it has referred to rivers being free highways.  With respect to ground transportation, the term "highway" similarly can mean any way open to the public, even including footpaths. The term especially has this meaning in English law when used in the context of prescriptive rights obtained by the public across private lands, and this meaning carried over into some American state law.

Under English law, too, better roads -- those that were built up so as to be literally "high" ways, typically connected towns or market places, etc. and enjoyed better protection for travelers – were known as "King's (or Queen's) highways". This usage gave rise to the second meaning of highway as "a main or principal road forming the direct or ordinary route between one town or city and another, as distinguished from a local, branch, or cross road, leading to smaller places off the main road, or connecting two main roads."

American dictionaries of common usage published near the time of enactment of R.S. 2477 indicate that this second meaning, that of principal public roads, was evidently the common American meaning at the time of enactment: highway was not defined in the generic sense as a travel corridor of any kind. Rather, the contemporaneous common usage dictionaries use "road" as the more generic term, and "highway" (at least in the context of ground transportation) to mean a more significant road.

Pamela Baldwin, *Highway Rights of Way on Public Lands: R.S. 2477 and Disclaimers of Interest* (Congressional Research Service Report for Congress, Order Code RL32142) 23-24 (2003) (footnotes omitted).  Taking into account definitions found in 1860 and 1865 editions of *Webster's American Dictionary of the English Language*, the author concluded:

Although the terms at times have been used interchangeably in discussing R.S. 2477, "highways" is the term used by Congress and it is used in conjunction with a requirement for construction.  "Roads" appears to be the more general term and "highways" the more specific term.  In other words, while all highways are roads, not all roads are highways, since, arguably, highways are public, and are more significant, built up roads.

*Id.* at 25 (footnote omitted); *see also Merriam-Webster's Collegiate Dictionary* 587 (11th ed. 2003) (defining "highway" as "a public way; *esp*: a main direct road").

thoroughfare which is used by the public, and is, in the language of the English books, common to all the King's subjects." *Pasadena & Mt. Wilson Toll Road v Schneider*, 31 I.D. 405, 407 (1902) (citations and quotations omitted).

> The grant of right of way by Section 2477, R.S., is not restricted to those which permit passage of broad, or of wheeled, vehicles, or yet to highways made, owned, or maintained by the public. Highways are the means of communication and of commerce. The more difficult and rugged is the country, the greater is their necessity and the more reason exists to encourage and aid their construction.

*Id.* at 407-08; *Cf.* Congressional Research Service, *Highway Rights of Way: The Controversy over Claims Under R.S. 2477*, at 8 (1993) ("[I]t appears likely that Congress in the 1866 Act used the term highway in the sense of a significant or principal road; namely, one that was open for public passage, received a significant amount of public use, had some degree of construction or improvement, and that connected cities, towns, or other significant places, rather than simply two places.").[12]

"Under traditional interpretations, therefore, the term 'highway' is congruent with and does not restrict the 'continuous public use' standard: any route that satisfies the user requirement is, by definition, a 'highway.'" *SUWA*, 425 F.3d at 782. To say that "'[i]t is unlikely that a route used by a single entity or used only a few times would qualify as a highway, since the route must have an open public nature and uses'" is "simply a restatement of the 'continuous public use' requirement of Utah law." *Id.* at 783. According to *SUWA*, then, an R.S. 2477 "highway" is defined by continuous use as a public thoroughfare for the required time.

The *SUWA* panel conceded that "'it is difficult to fix a standard by which to measure what

---

[12]The 1993 CRS Report is Addendum 17 *in* "Addendum - Brief of Amici Curiae Southern Utah Wilderness Alliance, et al.," (dkt. no. 131), with a corrected copy now on file (dkt. no.174).

is a public use or a public thoroughfare.'" *Id.* at 772 (quoting *Lindsay Land & Live Stock Co. v. Churnos*, 75 Utah 384, 391, 285 P. 646, 648 (1929)). "The requirements for establishing acceptance of a right of way by user cannot, we think, be captured by verbal formulas alone." *Id.* Instead, courts must consider "the factual circumstances of the decided cases, both those recognizing and those not recognizing the validity of R.S. 2477 claims," and determine whether the claimants "have met their burden of demonstrating acceptance under these precedents." *Id.* (footnote omitted). Proof that actual mechanical construction work was performed on the claimed road is not required to show acceptance; "evidence of actual construction (appropriate to the historical period in question), or lack thereof, can be taken into consideration as evidence of the required extent of public use, though it is not a necessary or sufficient element." 425 F.3d at 778.[13] Likewise, whether a claimed R.S. 2477 right-of-way has an identifiable destination is not

---

[13]According to the *SUWA* panel,

Historical records of early southern Utah road "construction" indicate that work was performed as economically as possible: if wagons could be conveyed across the land without altering the topography, there was no need for more extensive construction work. Typically, little more was done than move boulders, clear underbrush or trees, or dig the occasional crude dugway.
. . . .
Surely Congress did not require mechanical construction where no construction was needed. The necessary extent of "construction" would be the construction necessary to enable the general public to use the route for its intended purposes. . . . If a particular route sustained substantial use by the general public over the necessary period of time, one of two things must be true: either no mechanical construction was necessary, or any necessary construction must have taken place.
. . . .
As the precedents in Utah and other states demonstrate, a road may be created intentionally, by continued public use, without record evidence of . . . "mechanical construction." Such action is not haphazard, unintentional, or incomplete, though it might lack centralized direction; and the legal standard is not satisfied ''merely'' by evidence that vehicles may have passed over the land at some time

(continued...)

decisive; a court "should consider evidence regarding identifiable destinations as part of its overall determination of whether a contested route satisfies the requirements under state law for recognition as a valid R.S. 2477 claim." *Id.* at 783-84.

Under the current interpretive framework prescribed by the court of appeals in *SUWA*, the facts bearing upon the existence of an R.S. 2477 right-of-way must thus be viewed through a compound lens of federal and state law standards, precedents and policies. Viewed as such, whether an R.S. 2477 right-of-way exists is to be decided primarily by relying upon the lessons of prior experience in more or less similar cases.

For the *SUWA* panel, the leading example of helpful prior precedent is the Utah Supreme Court's opinion in *Lindsay Land & Live Stock Co. v. Churnos*, decided in 1929. In that opinion, the Utah court detailed the historical facts underpinning the R.S. 2477 right-of-way claim affecting public lands in Cache County that had passed into private ownership:

> The lands over which the highway is claimed are unenclosed and uninhabited mountain lands, suitable only for grazing purposes, and situated near the southern border of Cache County. The road extends across the lands in a general easterly and westerly direction following a part of its distance through a narrow canyon or pass called Davenport canyon. At the eastern terminus of the road is a large area of mountain land valuable for grazing animals in the summer season, a portion of which is now the Cache National Forest, and a portion in private ownership. This area has been extensively used for summer grazing for many years, by owners of sheep who trailed them over the route in question from the settled portions of the country lying to west, to the summer range in the spring of the year and back again in the fall. In 1876 a sawmill was constructed in Davenport canyon and the road in question was first definitely located and commenced to be used. People generally from the cities and villages in Box Elder and Cache counties approaching from the West traveled the road for the purpose

---

[13](...continued)
in the past. That is a caricature of the common law standard.

425 F.3d at 780, 781 (citation omitted).

of hauling lumber from the sawmill, and others from Ogden City and Ogden Valley, who had access to the eastern terminus of the road in question, used it for similar purposes. Other sawmills were set up at different places along the road during the years before 1890, and the road was generally traveled by many persons who had occasion to do so for the purpose of hauling logs to the sawmills and hauling lumber and slabs therefrom, and going to and from the sawmills for other purposes. In about the year 1885 a mining excitement in the locality resulted in the establishment of a mining camp called La Plata near the road in question. Houses were built, a post office established, and several hundred people resided in the camp for five or more years. During this period the road in question was traveled extensively by the general public in going to and from the mining camp. During all of the time from 1876 until shortly before the commencement of this action the road was used by numerous owners of sheep who had occasion to go that way for the purpose of trailing their herds to and from the summer range, and for the purpose of moving their camps and supplies to their herds. The use of the road for this purpose was general and extensive. One witness stated that "there must have been a hundred herds that went up there," another that he had "seen as high as seven herds a day'' going over the road. The mining business ceased in about the year 1890 and a few years later the saw mills disappeared. From since about the year 1900 the use of the road has been confined to stockmen driving their herds and hauling their supplies and camp outfits over it, and to a less frequent use by hunters, fishermen, and others who had occasion to travel over it. At times bridges were built and short dugways constructed by persons directly interested, but it does not appear that any public money was ever expended to maintain or repair the road. During the last four or five years the road in places has become impassable to ordinary vehicles, and has been used only for driving animals, pack outfits, etc., over it. Before the year 1894 the lands traversed by the road were unappropriated public lands of the United States. During the period of 1894 to 1904 the title to the lands passed from the federal government to the plaintiff or its grantors. The use of the road as above described was not interrupted by the change in the title or ownership of the lands, but continued thereafter as before stated. There was evidence that the travel over the road did not always follow an identical or uniform line, but at times and in a few places varied somewhat therefrom, and that sheep when trailing across would sometimes depart from the line of the road. There was ample positive evidence, however, that the road as described by the findings and decree was substantially the line and course of the road as it had been traveled and used for more than fifty years.

75 Utah at 386-88, 285 P. at 647. As framed by the Utah court in *Lindsay Land & Live Stock*, the

decisive question was whether there had been "continued use of the road by the public for such

length of time and under such circumstances as to clearly indicate an intention on the part of the

public to accept the grant" pursuant to R.S. 2477. *Id.*, 75 Utah at 389, 285 P. at 648.

> If the claim rested alone upon the use of the road for sawmill purposes, or for mining purposes, or for the trailing of sheep, the question would be more difficult. But here the road connected two points between which there was occasion for considerable public travel. The road was a public convenience. When sawmills were established on or near the road, it was used, not only by those conducting the sawmills, but by many others who went to the sawmills to get lumber, etc. During the period when the mining camp existed in the vicinity, the road was unquestionably used very extensively by the general public for general purposes. And all the time it was used as a general way for the driving or trailing of sheep. This latter use was not by a few persons, but by many persons, and it involved more than the mere driving of animals on the road. Camp outfits and supplies accompanied the herds and were moved over the road in camp wagons and on pack horses.

75 Utah at 391, 285 P. at 648. "While it is difficult to fix a standard by which to measure what is a public use or a public thoroughfare," the court continued,

> it can be said here that the road was used by many and different persons for a variety of purposes; that it was open to all who desired to use it; that the use made of it was as general and extensive as the situation and surroundings would permit, had the road been formally laid out as a public highway by public authority. We therefore conclude that the court was justified in finding that the road had been continuously and uninterruptedly used as a public thoroughfare for more than ten years.

*Id.*, 285 P. at 648-49.[14]

"At the opposite extreme," the *SUWA* panel cited *Cassity v. Castagno*, 10 Utah 2d 16, 347 P.2d 834, 835 (1959), in which "the Utah Supreme Court declined to recognize an R.S. 2477 right of way where one cattleman had a practice of herding his cattle across the lands of another to get to and from winter grazing land." *SUWA*, 425 F.3d at 773-74 (footnote omitted).[15]

---

[14]The trial court had found that the claimed road "was used as a public thoroughfare for the period from 1876 to 1894." 75 Utah at 390, 285 P. at 648.

[15]The fundamental R.S. 2477 problem in *Cassity v. Castagno* may have been that the

(continued...)

Ranging somewhere in between *Lindsay Land & Live Stock* and *Cassity* are cases such as *Jeremy v. Bertagnole*, 101 Utah 1, 116 P.2d 420 (1941), and *Boyer v. Clark*, 7 Utah 2d 395, 326 P.2d 107 (1958). *Id.* at 774-75 (discussing cases). In each of those cases, the R.S. 2477 grant was found to have been accepted by continuous public use of the claimed road for more than ten years by various persons and for varying purposes: "the public, even though not consisting of a great many persons, made a continuous and uninterrupted use" of the claimed road "as often as they [find] it convenient or necessary," *Boyer*, 7 Utah 2d at 397-98, 326 P.2d at 109, establishing "the existence for many years of this roadway, openly used as the public might desire for vehicular, pedestrian, and equestrian traffic," *Jeremy*, 101 Utah at 10-11, 116 P.2d at 424; *see also Leo M. Bertagnole, Inc. v. Pine Meadow Ranches*, 639 P.2d 211, 213 (Utah 1981) (non-R.S. 2477 highway dedicated by continuous public use under Utah law). Under Utah law, "continuous use" need not necessarily be constant use, "'*provided it occurred as often as the claimant had occasion or chose to pass*. Mere intermission is not interruption.'" *Campbell v. Box Elder County*, 962 P.2d 806, 809 (Utah Ct. App. 1998) (emphasis in original) (quoting *Richards v. Pines Ranch, Inc.*, 559 P.2d 948 (Utah 1977).

> Under Utah law, use need not be regular to be continuous. Even infrequent use can result in dedication of a road as a public thoroughfare. However, under the continuous use requirement, members of the public must have been able to use the road whenever they found it necessary or convenient.

*Id.*

More recently, in *Wasatch County v. Okelberry*, 2008 UT 10, 179 P.3d 768, the Utah

---

[15](...continued)
feuding brothers-in-law were both private landowners; apparently no public land was involved in the claim. 10 Utah 2d at 17-18, 347 P.2d at 835.

Supreme Court undertook to articulate "a clear, workable standard" defining "continuous use" for purpose of the Utah statute governing dedication of public highways. 2008 UT 10, at ¶ 12, 179 P.3d at 774. "[W]e understand 'continuously' to have its plain meaning of 'without interruption.' A party claiming dedication must therefore establish by clear and convincing evidence that a road has been used *without interruption* as a public thoroughfare for ten years in order for the road to become dedicated to public use." 2008 UT 10, at ¶ 14, 179 P.3d at 774 (emphasis in original; footnote omitted).[16]

> In order to elucidate this standard, we think it helpful to distinguish between an interruption in use and an intermission in use. The distinction lies in the intent and conduct of the property owner. As noted above, a road may be used continuously even if it is not used constantly or frequently. For example, a road may be used by only one person once a month, but if this use is as frequent as the public finds it "convenient or necessary," and the landowner has taken no action intended and reasonably calculated to interrupt use, the use is continuous. The one-month period of time between usages is a mere intermission, not an interruption. Likewise, a road may be heavily traveled by the public during certain times of the year but impassable because of weather-related conditions at other times. Though the use is not constant, if it occurs as often as the public finds it convenient or necessary, and the landowner has taken no action intended and reasonably calculated to interrupt use, the use is continuous. The period of impassability due to weather is a mere intermission, not an interruption.

2008 UT 10, at ¶ 16, 179 P.3d at 774 (footnotes omitted); *see Utah County v. Butler*, 2008 UT

---

[16]The Utah court noted that "*Merriam-Webster's Collegiate Dictionary* defines "continuous" as "marked by uninterrupted extension in space, time, or sequence." *Merriam-Webster's Collegiate Dictionary* 270 (11th ed. 2003). 2008 UT 10, at ¶ 14 n.23, 179 P.3d at 774 n.23.

Ironically, *Okelberry*'s insertion of the "without interruption" element into the continuous use analysis effectively reads language into of the "plain meaning" of the Utah statute that the Utah Legislature expressly removed from the statute by amendment in 1898. *See* Comment, *Use Interrupted: The Complicated Evolution of Utah's Highway Dedication Doctrine*, 2008 Utah L. Rev. 1613, 1622 & nn.87-91, 1636. Prior to 1898, the Utah statute read: "A highway shall be deemed and taken as dedicated and abandoned to the use of the Public when it has been continuously *and uninterruptedly* used as a Public thoroughfare for a period of ten years." 1886 Utah Laws ch. 12, § 2.

12, ¶ 15, 179 P.3d 775, 781 ("[G]roundwater that flooded the Road in the spring and snow that covered the Road in the winter did not interrupt the Road's continuous use for purposes of the Dedication Statute.").  "Continuous use" in this sense equates with use uninterrupted by the landowner's overt acts.  But the *Okelberry* court cautioned:

> This rule does not change the burden of the party claiming dedication.  For a highway to be deemed dedicated to the public, the party claiming dedication must establish by clear and convincing evidence that the road at issue was continuously used as a public thoroughfare for a period of ten years; credible evidence of . . . an overt act intended to and reasonably calculated to interrupt use of a road as a public thoroughfare . . . simply precludes a finding of continuous use.

2008 UT 10, at ¶ 15, 179 P.3d at 774.

*Okelberry* did not address what use "as a public thoroughfare" entails, leaving that question to a companion case, *Utah County v. Butler*, 2008 UT 12, 179 P.3d 775.  According to *Butler*, "[a] road is continuously used as a public thoroughfare when 'the public [makes] a continuous and uninterrupted use' of the road 'as often as they [find] it convenient or necessary.'" 2008 UT 12, ¶ 14, 179 P.3d at 782.  Based upon the "plain meaning" of the Utah highway dedication statute, *Butler* instructs that "[t]he 'public' is commonly understood to be 'the people as a whole.'" 2008 UT 12, ¶ 20, 179 P.3d at 783 (footnote omitted) (quoting *Merriam-Webster's Collegiate Dictionary* 1005 (11th ed. 2003)).[17]  Continuous use *as a public*

---

[17]The "public" has exceptions, as the *Butler* court explained:

> [C]ertain persons are not members of the public for purposes of the Dedication Statute.  Individuals with a private right to use a road, such as adjoining property owners who "may have documentary or prescriptive rights to use the road," are not members of the public, nor are those who have been given permission to use a road.   But other than these two classes of individuals, we have not otherwise defined who constitutes the public for purposes of the Dedication Statute.

(continued...)

*thoroughfare* may thus be found where "the road in question had been used freely by the general public," that is, by the people as a whole. *Thurman v. Byram*, 626 P.2d at 449. As the Utah Supreme Court explained in *Heber City Corp. v. Simpson*, 942 P.2d 307 (Utah 1997),

> Perhaps our most detailed definition of "public thoroughfare" was announced in *Morris v. Blunt*, 49 Utah 243, 161 P. 1127, 1131 (1916), where we stated:
>
>> A "thoroughfare" is a place or way through which there is passing or travel. It becomes a "public thoroughfare" when the public have a general right of passage. Under [the identically worded predecessor statute to section 27-12-89,] the highway, even though it be over privately owned ground, will be deemed dedicated or abandoned to the public use when the public has continuously used it as a thoroughfare for a period of 10 years, *but such use must be by the public*. Use under private right is not sufficient. If the thoroughfare is laid out or used as a private way, its use, however long, as a private way, does not make it a public way; and the mere fact that the public also make use of it, without objection from the owner of the land, will not make it a public way. . . .

*Id.* at 311 (emphasis added).

In *Thurman*, the Utah court concluded that in that case, "evidence of public use clearly supports the judgment of the trial court that the road had become a public thoroughfare. The determination that a roadway has been continuously used by members of the general public for at least 10 years is the sole requirement for it to become a public road." *Id.*; *see also Schettler v. Lynch*, 23 Utah 305, 314, 64 P. 955, 956 (1901) (highway dedication inferred from "long-continued use by the public"); *Wilson v. Hull*, 7 Utah 90, 92, 24 P. 799, 800 (1890) (highway dedication inferred from acquiescence in "continual use as a road by the public").[18]

---

[17](...continued)
2008 UT 12, ¶ 19, 179 P.3d at 782.

[18]In the absence of statutory guidance in 1890 territorial Utah, the *Wilson* court looked to

(continued...)

The evidence of public use in *Thurman* was substantial:

> Numerous witnesses testified that they had used the property frequently for more than 20 years, that they had observed other members of the general public using the road, and that until 1978 they had never been asked not to use it, nor had they been prevented from doing so. The road provided the only access to certain Forest Service property which was used by the public. State and county crews had assisted in the installation of a bridge in the road which had been moved there from another location. Both the former county sheriff and the present sheriff testified that they had observed the general public using the roadway for many years.

*Id.* Thus, as recently summarized by the Utah Court of Appeals, "[t]o satisfy the public thoroughfare element, Plaintiffs must demonstrate proof of (i) passing or travel, (ii) by the public . . . ." *Jennings Investment, LC v. Dixie Riding Club, Inc.*, 2009 UT App 119, ¶ 11, 208 P.3d 1077, 1081 (citing *Heber City*, 942 P.2d at 311).

Finally, under Utah law, "'[c]ontinuous use as a public thoroughfare must occur for *at least* ten years.'" *Utah County v. Butler*, 2008 UT 12, ¶ 23, 179 P.3d at 783 (emphasis in original; footnote omitted) (quoting *Heber City*, 942 P.2d at 312). Given the language of R.S. 2477 granting rights-of-way for the construction of highways "over public lands, *not reserved for*

---

[18](...continued)
the lessons of experience in other jurisdictions in instances in which an owner intended to dedicate land for use as a highway:

> In England it appears to have been settled that acceptance may be inferred from the use of the land by the public for the purpose of a highway, without the action of the body charged with its repair; that the acceptance may be by the public generally, as evidenced by a mere use of the way. In this territory there is no statute requiring any formal acceptance by officers or agents in charge of public roads of land dedicated by the owners for highways, and we are not prepared to say that the acceptance may not be inferred under some circumstances from the action and use of the public generally, without any action of the body charged with the repair of public roads.

7 Utah at 93-94, 24 P. at 800.

*public uses*," in this case the plaintiffs must show that the statutory ten-year period was satisfied *before* the land upon which their claimed right-of-way is located was withdrawn and reserved for use as part of Canyonlands National Park.  *See SUWA*, 425 F.3d at 784 ("R.S. 2477 rights of way may be established only over lands that are 'not reserved for public uses.'").

### BACKGROUND & CONTEXT

### Creation of Canyonlands National Park

Bates Wilson, superintendent of Arches National Monument (now Arches National Park) in the 1950s initiated the effort to establish a national park surrounding the confluence of the Green and Colorado Rivers.  In the 1950s, Wilson explored the surrounding canyon region and hosted government officials and journalists on jeep tours through the area during the late 1950s and early 1960s—as documented, for example, in the May 1962 issue of the *National Geographic* magazine in an article titled "Cities of Stone in Utah's Canyonlands," (Plaintiffs' Exhibit ("PX-") 26).  Other enthusiasts such as Kent Frost, who began a commercial jeep tour business in 1958, introduced tourists to the scenic wonders of canyon country, including Salt Creek Canyon and Angel Arch.

The establishment of Canyonlands National Park resulted from several years of concerted legislative and administrative activity spearheaded by Senator Frank E. Moss (D-UT) and Secretary of the Interior Stewart L. Udall, and was a matter of some local controversy.  *See* Thomas G. Smith, *The Canyonlands National Park Controversy, 1961-64*, 59 Utah Hist. Q. 216 (no. 3, Summer 1991).

On April 9, 1962, the Department of the Interior filed an application of withdrawal for 330,272 acres of land  in aid of legislation to create Canyonlands National Park.  On May 26,

1962, notice of this application was published in the *Federal Register*, describing the withdrawal

of these lands "from all forms of appropriation except leasing under the mineral leasing laws,

location and entry of metalliferous minerals under the mining laws, and grazing." 27 Fed. Reg.

4969 (May 26, 1962); *see* 43 C.F.R. § 295.11 (a) (1962).

On September 12, 1964, Congress  President Lyndon B. Johnson signed Public Law

88-590, creating Canyonlands National Park, reciting that

> in order to preserve an area in the State of Utah possessing superlative scenic,
> scientific, and archeologic features for the inspiration, benefit, and use of the
> public, there is hereby established the Canyonlands National Park which, subject
> to valid existing rights, shall comprise the following generally described lands . . .

Pub. L. 88-950, § 1, 78 Stat. 934 (1964).  Initially consisting of 257,640 acres (402 square miles),

Congress expanded Canyonlands to its present size of 337,598 acres (527 square miles) by

amendment on November 12, 1971, providing in part that

> in order to preserve an area in the State of Utah possessing superlative scenic,
> scientific, and archeologic features for the inspiration, benefit, and use of the
> public, there is hereby established the Canyonlands National Park which, subject
> to valid existing rights, shall comprise the area generally depicted on the drawing
> entitled "Boundary Map, Canyonlands National Park, Utah," numbered
> 164-91004 and dated June 1970, which shows the boundaries of the park having a
> total of approximately three hundred and thirty-seven thousand two hundred and
> fifty-eight acres. The map is on file and available for public inspection in the
> offices of the National Park Service, Department of the Interior.

Pub. L. 92-154, § 1(a), 85 Stat. 421 (1971), *codified at* 16 U.S.C. § 271.

The legislation establishing Canyonlands National Park also invoked the provisions of the

Park Service's 1916 Organic Act, 16 U.S.C. §§ 1, 2-4: "the administration, protection, and

development of the Canyonlands National Park, as established pursuant to this subchapter, shall

be exercised by the Secretary of the Interior in accordance with the provisions of sections 1, 2, 3,

and 4 of this title, as amended and supplemented." Pub. L. 88–590, § 5, 78 Stat. 939, *codified at*

16 U.S.C. §271d. The 1916 Organic Act mandates that the Park Service pursue the dual goals of

promoting resource conservation and visitor enjoyment:

> The service . . . shall promote and regulate the use of the Federal areas known as
> national parks, monuments, and reservations hereinafter specified, . . . by such
> means and measures as conform to the fundamental purpose of the said parks,
> monuments, and reservations, which purpose is to conserve the scenery and the
> natural and historic objects and the wild life therein and to provide for the
> enjoyment of the same in such manner and by such means as will leave them
> unimpaired for the enjoyment of future generations.

16 U.S.C. § 1.

The uniqueness of the geography of the reserved lands "within the scenic heart of the

Colorado Plateau," justified its protection as a national park:

> Although some of the individual features (arches, cliffs, canyons, colorful rock
> layers, semi-desert flora and fauna) are also found in other units of the National
> Park System, many are not duplicated elsewhere, and the total assemblage of
> features and their visual aspect is unique. Nowhere else is there a comparable
> opportunity to view a colorful, exciting, geologically significant wilderness from
> above, and then get down into its midst--and still not lose the atmosphere of
> remote wilderness.

S. Rep. No. 88-381, at 6 (1963); H. R. Rep. No. 88-1823, at 5 (1964), *reprinted in* 1964

U.S.C.C.A.N. 3718, 3719. This "'scenery of erosion'"[19] includes "gigantic standing rock

formations, towering buttes, natural bridges or arches, balanced rock formations, and other

evidences of mighty geologic forces and millions of years of erosion."[20] With its "hundreds of

---

[19] H. R. Rep. No. 88-1823, at 5, *reprinted in* 1964 U.S.C.C.A.N. 3718, 3719 ("The whole
area presents 'the scenery of erosion,' as the National Park Service described it in its pamphlet
report on Canyonlands, dated March 1962."); S. Rep. No. 88-381, at 4.

[20] H. R. Rep. No. 88-1823, at 9, 1964 U.S.C.C.A.N. at 3723; S. Rep. No. 88-381, at 1-2.

colorful canyons, mesas, buttes, fins, arches, and spires,"[21] Canyonlands preserves "one of the last, relatively undisturbed areas of the Colorado Plateau,"[22] encompassing remarkable geologic, archaeological and ecological resources. *See* S. Rep. No. 88-381, at 2-7 (describing the scenic beauty of the proposed park, its geological features, its plant and animal life, and its archeological significance); H. R. Rep. No. 88-1823, at 6, 1964 U.S.C.C.A.N. at 3719-20 (same).

**Prior Litigation Concerning the Salt Creek Road**

In 1992 the National Park Service began preparation of a Backcountry Management Plan for Canyonlands National Park.   In January of 1995, the National Park Service issued a revised Backcountry Management Plan ("BMP") for Canyonlands which addressed, among other things, motorized vehicle use for the claimed Salt Creek road.  (*See* Defendants' Exhibit ("DX-") 201.) The BMP did not close the claimed Salt Creek road to motor vehicle access, but left it open to vehicles on a limited basis of ten permits per day for private motor vehicles and two permits per day for commercial motor vehicle tours; the Park Service installed the "Permit Gate" at this time to regulate vehicle access to the Salt Creek road.  (*See* Final Pretrial Order, filed August 25, 2009 (dkt. no. 120) ("FPO"), at 16 ¶ 24 (uncontroverted facts).)[23]  Pursuant to the BMP, the Park

---

[21]http://www.nature.nps.gov/geology/parks/cany/index.cfm#geology.

[22]http://www.nps.gov/cany/index.htm.

[23]As Judge Kimball explained,

In implementing the BMP, the NPS chose not to prohibit motor vehicle use on Salt Creek Road, even though such a prohibition was the preferred alternative in its Environmental Assessment. The NPS instead implemented the permit system, finding that the Organic Act and the Canyonlands Enabling Act (the "Enabling Act") require a balancing between competing mandates of resource conservation and visitor enjoyment, and the permit system represented a reasonable

(continued...)

Service also closed the one-half mile segment of the road in the main Salt Creek Canyon between the junction with Angel Arch Canyon and the Bates Wilson camp, south of the claimed Salt Creek road. (Transcript of Trial, dated Sept. 18, 2009, at 40:4-42:25 (testimony of Kate Cannon); *see* DX-201.)

In June 1995, the Southern Utah Wilderness Alliance filed a lawsuit against the National Park Service challenging, among other things, the agency's decision to issue permits for continued four-wheel drive vehicle access to Salt Creek Canyon from Peekaboo Spring to Angel Arch. *Southern Utah Wilderness Alliance v. Dabney*, Civil No. 2:95-CV-0559DAK (D. Utah).[24]

In 1998, the district court vacated and enjoined the Park Service's decision to allow continued vehicle access in Salt Creek Canyon above (south of) Peekaboo Spring. *See Southern Utah Wilderness Alliance v. Dabney*, 7 F. Supp. 2d 1205, 1212 (D. Utah 1998), *rev'd*, 222 F.3d 819 (10th Cir. 2000); Judgment in a Civil Case, filed September 23, 1998 (dkt. no. 113), in *Southern Utah Wilderness Alliance v. Dabney*, Civil No. 2:95-CV-559DAK (D. Utah).). In compliance with the district court's 1998 ruling, the Park Service placed a second gate in Salt Creek Canyon at Peekaboo Spring which was locked to prevent motor vehicles from traveling

---

[23](...continued)
accommodation of these conflicting mandates where a complete prohibition on motor vehicle use would not.

*Southern Utah Wilderness Alliance v. Dabney*, 387 F. Supp. 2d 1178, 1180 (D. Utah 2005).

[24]San Juan County and the State of Utah were named as defendants in a SUWA amended complaint, but were dismissed from the case in January 2003 because neither of them had filed a claim against the United States affirmatively invoking jurisdiction under the Quiet Title Act, and thus could not litigate the validity of their R.S. 2477 claim concerning the Salt Creek route. (*See* Order, filed January 15, 2003 (dkt. no. 228), in *Southern Utah Wilderness Alliance v. Dabney*, Civil No. 2:95-CV-559DAK (D. Utah).)

beyond that point.

The Utah Shared Access Alliance and four other intervenor-defendants (not the Park Service) appealed from the district court's ruling, and on August 15, 2000, the Court of Appeals reversed. *See Southern Utah Wilderness Alliance v. Dabney*, 222 F.3d 819, 823 (10th Cir. 2000). The case was remanded to the district court for application of different standards of deference, re-examination of the administrative record, and consideration of a new agency policy—if finalized—relating to determinations of "impairment of park resources and values," a central issue in the case. 222 F.3d at 829-30.

Following remand, the Park Service continued to prohibit motor vehicle travel in Salt Creek Canyon above the gate near Peekaboo Spring, pending further evaluation of the effects of motor vehicle access on resources and values in the canyon,[25] and San Juan County notified the Park Service that it claimed the Salt Creek Canyon route as a county road pursuant to R.S. 2477.[26]

### The Plaintiffs' Claims in This Proceeding

San Juan County and the State of Utah claim joint undivided ownership in a public highway right-of-way ostensibly granted by Congress and accepted by the public under R.S. 2477, traversing the Salt Creek drainage from a point near Cave Spring to a point very near to Angel Arch. This "controversy is one of many throughout the West that concern an alleged

---

[25](Transcript of Trial, dated Sept. 23, 2009 Morning Session, at 31:3-21, 33:2-41:4 (testimony of Philip R. Brueck); *see also* DX-202 (2002 Environmental Assessment). )

[26]San Juan County had previously made such a claim in comments submitted during the environmental assessment process for the Canyonlands Backcountry Management Plan in March of 1994.

right-of-way across federal land arising under Revised Statute 2477, enacted by Congress in 1866." *San Juan County*, 503 F.3d at 1167. As the court of appeals explains, "San Juan County's quest for title to Salt Creek Road stems from its dissatisfaction with restrictions on travel imposed while the road has been under federal control." *Id.* at 1168.

On June 14, 2004, the Park Service published a Final Rule amending its regulations to prohibit motor vehicle access to Salt Creek Canyon above Peekaboo Spring ("the Final Rule"). 69 Fed. Reg. 32871 (June 14, 2004) (*codified at* 36 C.F.R. § 7.44); (*see* DX-204). The Final Rule reflected a significant change in position from the agency's 1995 Backcountry Management Plan ("BMP"):

> Unlike the BMP, the Final Rule implements the NPS's Environmental Assessment's preferred alternative by completely prohibiting motor vehicle use above Peekaboo campsite. The NPS justifies this change in position by relying on its 2001 Management Policies, which interpret the Organic Act as placing an overarching concern on preservation of resources where there is a conflict between conserving resources and providing for the enjoyment of them.

*Southern Utah Wilderness Alliance v. Dabney*, 387 F. Supp. 2d 1178, 1180-81 (D. Utah 2005). Judge Kimball ruled that the 2004 "Final Rule, which prohibits motor vehicle use in Salt Creek Canyon above Peekaboo campsite, is based upon a permissible construction of the [National Park Service] Organic Act and [Canyonlands] Enabling Act and is supported by the Administrative Record," and he rejected the motor vehicle users' challenge to that Rule under the Administrative Procedure Act, 5 U.S.C. § 706(2). *Id.* at 1199.

> Without waiting a day, the County filed this quiet-title action, naming the United States, the Department of Interior, and the NPS as defendants. The first cause of action in its amended complaint, filed on June 30, 2004, claims an R.S. 2477 right-of-way in Salt Creek Road. It alleges that the NPS's "acts have wrongfully denied [the County] and the public the use of the Salt Creek road and disturbed [the County's] quiet enjoyment of its R.S. 2477 right-of-way." . . . The second

-30-

cause of action seeks a declaration that a system of gates put in place by the NPS deprives the County of its use of the right-of-way for vehicular travel.

       The County asserts that it acquired its right-of-way before the federal government reserved the land for Canyonlands National Park in 1962.  *See* Nat'l Park Serv., Canyonlands Environmental Assessment Middle Salt Creek Canyon Access Plan, app. 4, at 159 (June 2002) (explaining that land for Canyonlands National Park was withdrawn on April 4, 1962, in anticipation of legislation to establish the Park).  Its amended complaint details a series of alleged uses of the right-of-way from the 1890s through 1962, including construction and use of a road by a homesteader to access his homestead, construction and use of a road by a cattle company to trail cattle and haul supplies, use by hikers and explorers, use by persons in jeeps for commercial and sightseeing purposes, and use by oil and gas companies to access drilling locations.  It claims that the right-of-way must be "sufficient in scope for vehicle travel as reasonable and necessary and according to the uses to which it was put prior to" April 1962. . . .

*San Juan County*, 503 F.3d at 1170-71 (citations to record omitted).

       Plaintiffs contend that continuous public use of the Salt Creek road for a period in excess of ten years prior to reservation of public lands for Canyonlands National Park evidences the acceptance of the grant of an R.S. 2477 public highway right-of-way for the Salt Creek road from Cave Spring through Salt Creek Canyon to Angel Arch.  They assert that the known history of the Salt Creek road dates back to the late 1890s, when it was first used by a cattleman, Rensselaer Lee Kirk, who homesteaded in the Upper Salt Creek canyon, constructing a cabin and other improvements—still known as Kirk's Cabin—several miles south of the road claimed in this action.  (*See* FPO at 3.)  Plaintiffs assert that for many years, cattle ranching and agricultural activities were the primary known use of much of the claimed Salt Creek road, and that from this modest start, the local knowledge and public uses of the Salt Creek road grew to include motor vehicle travel by explorers, commercial jeep tours, uranium miners, oil and gas drilling operators, and hunters.  (*Id.*)  Plaintiffs claim that during the southeastern Utah "uranium boom" in the

1950s, many former trails, wagon roads and two-track jeep trails in the area were bulldozed to

facilitate uranium exploration, and that by 1956, the Salt Creek road itself had been improved

using a bulldozer at various points in Salt Creek Canyon up to a mining campsite for the "Honest

John Uranium Corporation" near a point called Upper Jump, which lies several miles south of

the road claimed in this case. (*Id.* at 4.)

> Even more significant than mining was the discovery of Angel Arch:

>> One of the most famous arches in the nation, Angel Arch, lies a little over a mile up a side canyon from the Salt Creek canyon. The exact date when the first modern traveler reached Angel Arch is unknown. However, plaintiffs allege that there is evidence to suggest the first motor vehicle may have traveled the Salt Creek road and its visitors viewed Angel Arch in 1949. Plaintiffs also claim that in1951, a group of boy scouts from Moab, Utah, travelled in several jeeps on part of the Salt Creek road to explore an adjacent canyon called Horse Canyon. Plaintiffs claim that, by similar trips in 1953 and 1954, these scout explorations included travel by jeeps to Angel Arch. By the later 1950's, commercially guided jeeps would deliver visitors along the Salt Creek road to Angel Arch as their prime destination. Plaintiffs assert that private jeep trips to Angel Arch added to the use of the Salt Creek road.
>> . . . .

>> Plaintiffs contend that, from the establishment of Canyonlands in 1964 until recently, motor vehicle travel along the Salt Creek road to Angel Arch remained as the heart of the Needles district experience. By the mid 1990's, more than 1,000 vehicles per month in peak seasons traveled the Salt Creek road. In 1995, the Park Service NPS began to limit the number of daily vehicle trips (to no more than 10 private vehicles and nor more than 2 commercial vehicle concession trips per day) on the Salt Creek road through a permit system and gate located near the north end of the Salt Creek road. *Plaintiffs do not challenge this limitation.* Plaintiffs recognize that the Salt Creek road is unique, rugged and deserving of proper management to protect the road, adjacent resources, and most importantly the unique experience it has offered the public for decades.

(*Id.* at 4, 5 (emphasis added).) By this proceeding, the plaintiffs seek to restore motor vehicle

access up Salt Creek Canyon to Angel Arch, and they assert that "the Salt Creek Road is

sufficient in scope and length and use and history to accommodate jeep road travel under the ten-

vehicle-per-day permit system" prescribed in the Park Service's 1995 Backcountry Management Plan, as described above. (Transcript of Trial, dated October 9, 2009, at 28:24-29:1 (Mr. Welch) (closing arguments).)

In essence, San Juan County and the State of Utah seek to vindicate their claimed R.S. 2477 right-of-way in order to return to the *status quo ante*—prior to the 1998 injunction and 2004 final rule that closed the Salt Creek Road to all motor vehicle access above Peekaboo Spring. (*See id.* at 28:17-20 ("in this lawsuit . . . neither San Juan County or the State of Utah have challenged the restriction on the road put in place through the permit gate" pursuant to the 1995 Backcountry Management Plan).)

### The Defendants' Response

As noted above, the defendants contend that the plaintiffs' claims are barred as untimely by the Quiet Title Act's statute of limitations. (*Id.* at 6-8.) Limitations aside, the defendants assert that the plaintiffs cannot demonstrate that their claimed R.S. 2477 right-of-way was established prior to the creation of Canyonlands National Park on September 12, 1964, because they cannot prove (1) the actual physical existence of a road in Salt Creek Canyon no later than September of 1964; and (2) the use of such a road as a public thoroughfare for the ten-year period required under Utah law with sufficient continuity and frequency to establish an R.S. 2477 right-of-way, prior to the creation of the Park. (*Id.* at 8-10.) Finally, the defendants contend that the plaintiffs "cannot meet their burden of establishing that the specific public uses claimed for the alleged right-of-way, including travel by vehicles, horseback, or on foot, were made with sufficient frequency and continuity over the required ten year period to establish an R.S. 2477 right-of-way for those uses." (*Id.* at 11.)

**QUIET TITLE ACT – STATUTE OF LIMITATIONS**

At the outset, the defendants insist that the plaintiffs waited too long to commence this action to vindicate their R.S. 2477 right-of-way claims in the Salt Creek drainage and that consequently, this court lacks subject matter jurisdiction of those claims. Because the timeliness issue has jurisdictional consequences, it presents a threshold question in this proceeding.

Under federal sovereign immunity principles, the United States is deemed to be immune from suit unless and only to the extent that Congress expressly waives that immunity. *See Lane v. Pena*, 518 U.S. 187, 192 (1996);[27] *Lehman v. Nakshian*, 453 U.S. 156, 160 (1981).[28] The federal Quiet Title Act ("QTA") constitutes a limited waiver of the United States' sovereign

---

[27]As the Court explained in *Lane*:

> A waiver of the Federal Government's sovereign immunity must be unequivocally expressed in statutory text, *see, e.g., United States v. Nordic Village, Inc.*, 503 U.S. 30, 33-34, 37, 112 S. Ct. 1011, 1014-1015, 1016, 117 L. Ed.2d 181 (1992), and will not be implied, *Irwin v. Department of Veterans Affairs*, *supra*, at 95, 111 S.Ct., at 457. Moreover, a waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign. See, *e.g., United States v. Williams*, 514 U.S. 527, 531, 115 S. Ct. 1611, 1616, 131 L. Ed.2d 608 (1995) (when confronted with a purported waiver of the Federal Government's sovereign immunity, the Court will "constru[e] ambiguities in favor of immunity"); *Library of Congress v. Shaw*, 478 U.S. 310, 318, 106 S.Ct. 2957, 2963, 92 L. Ed. 2d 250 (1986); *Lehman v. Nakshian*, 453 U.S. 156, 161, 101 S. Ct. 2698, 2702, 69 L. Ed.2d 548 (1981) ( "[L]imitations and conditions upon which the Government consents to be sued must be strictly observed and exceptions thereto are not to be implied").

518 U.S. at 192.

[28]"[T]he Court has recognized the general principle that 'the United States, as sovereign, "is immune from suit save as it consents to be sued . . . and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit."'" *Lehman*, 453 U.S. at 160 (quoting *United States v. Testan*, 424 U.S. 392, 399 (1976) (quoting *United States v. Sherwood*, 312 U.S. 584, 586 (1941))).

immunity in civil actions brought "to adjudicate a disputed title to real property in which the United States claims an interest . . . ." 28 U.S.C. § 2409a(a). The QTA provides the "exclusive means by which adverse claimants [may] challenge the United States' title to real property." *Block v. North Dakota*, 461 U.S. 273, 286 (1983). The QTA includes its own twelve-year statute of limitations:

> Any civil action under this section, except for an action brought by a State, shall be barred unless it is commenced within twelve years of the date upon which it accrued. Such action shall be deemed to have accrued on the date the plaintiff or his predecessor in interest knew or should have known of the claim of the United States.

28 U.S.C. § 2409a(g); *see* 28 U.S.C. § 2409a(i) & (k) (specific twelve-year limitations period and notice requirements applicable to actions by States).[29] Thus, the QTA explicitly requires that actions brought under its terms must be commenced within twelve years of the date upon which the cause of action accrued, namely "the date that the plaintiff or his predecessor in interest knew or should have known of the claim of the United States," 28 U.S.C. § 2409a(g), or "the date thje State received notice of the Federal claims to the lands." 28 U.S.C. § 2409a(i). For purposes of determining when a QTA claim has accrued, "[a]ll that is necessary is a reasonable awareness that the Government claims some interest adverse to the plaintiff's." *Knapp v. United States*,

---

[29]Because it constitutes a waiver of federal sovereign immunity, the QTA must be strictly construed, and the limitations set forth in the statute, including those concerning the time for commencing civil actions, must be strictly enforced. *See United States v. Mottaz*, 476 U.S. 834, 841 (1986); *United States v. Testan*, 424 U.S. 392, 399 (1976). These limits are jurisdictional: "'When the United States consents to be sued, the terms of its waiver of sovereign immunity define the extent of the court's jurisdiction.'" *Consejo de Desarollo Economico de Mexicali, A.C. v. United States*, 482 F.3d 1157, 1173 (9th Cir. 2007) (quoting *Mottaz*, 476 U.S. at 841); *see Block*, 461 U.S. at 292; *Skranak v. Castenada*, 425 F.3d 1213, 1216 (9th Cir. 2005) ("Such bar is jurisdictional. The Quiet Title Act is a waiver of sovereign immunity. If the statute of limitations has run on a waiver of sovereign immunity, federal courts lack jurisdiction.").

636 F.2d 279, 283 (10th Cir. 1980); *but cf. Fadem v. United States*, 52 F.3d 202, 207 (9th Cir. 1995).

Where a plaintiff's cause of action under the QTA is based upon a non-possessory interest such as a claimed easement or right-of-way across government-owned land, "knowledge of a government claim of ownership may be entirely consistent with a plaintiff's claim. "A plaintiff's cause of action for an easement across government land only accrues when the government, 'adversely to the interests of plaintiffs, denie[s] or limit[s] the use of the roadway,'" *Michel v. United States*, 65 F.3d 130, 132 (9th Cir. 1995) (quoting *Werner v. United States*, 9 F.3d 1514, 1516 (11th Cir.1993)), or when the plaintiff "or his predecessors-in-interest 'knew or should have known the government claimed the exclusive right to deny their historic access.'" *McFarland v. Norton*, 425 F.3d 724, 727 (9th Cir. 2005) (quoting *Michel*, 65 F.3d at 132).[30]

By themselves, the inclusion of a claimed R.S. 2477 right-of-way within the lands of Canyonlands National Park and the exercise by the Park Service of administrative authority over the lands embracing the claimed right-of-way do not signal that the United States has asserted an

---

[30]In *Park County v. United States*, 626 F.2d 718 (9th Cir. 1980), the Ninth Circuit affirmed the district court's dismissal of two counties' claim of an R.S. 2477 right-of-way based on the QTA's statute of limitations where the Forest Service's maintenance of the road in question, a portion of which followed two Forest Service trails, had been exclusive and included placement of a sign and rock barrier prohibiting motor vehicles on a portion of the claimed road. In *Southwest Four Wheel Drive Ass'n v. Bureau of Land Management*, 271 F. Supp. 2d 1308, 1312 (D.N.M. 2003), *aff'd on other grounds*, 363 F. 3d 1069 (10th Cir. 2004), the district court ruled that the designation of a wilderness study area encompassing claimed R.S. 2477 rights-of-way put the right-of-way claimants and the public on notice, as of the date of publication of the study area designation, "that BLM claimed all the area and did not recognize any alleged rights-of-way," thus triggering the QTA's twelve-year statute of limitations as to any R.S. 2477 claims.

exclusive right to deny access sufficient to trigger a QTA action.[31]  Lands were reserved and set

aside for the Park "subject to valid existing rights," including R.S. 2477 rights-of-way.

Moreover, "the National Park Service has obligations to protect National Park land," including

land underlying or contiguous to an R.S. 2477 right-of-way.  *SUWA*, 425 F.3d at 747.  The

"'power to regulate within a national park to "conserve the scenery and the nature and historic

objects and wildlife therein . . . ." applies with equal force to regulating an established

right-of-way within the park,' including an R.S. § 2477 right-of-way held by the County."

*United States v. Garfield County*, 122 F. Supp. 2d 1201, 1240-41 (D. Utah 2000) (quoting *United

States v. Vogler*, 859 F.2d 638, 642 (9th Cir. 1988)).[32]

But the defendants' assertion concerning the "complete, absolute and exclusive

jurisdiction and control the Park Service has exercised openly and without challenge over Salt

Creek Canyon and the claimed Salt Creek road" since the creation of the Park seemingly begs the

question of the existence of the plaintiffs' claimed R.S. 2477 right-of-way in Salt Creek Canyon.

(Federal Defendants' Trial Memorandum, filed September 5, 2009 (dkt. no. 123) ("U.S. Trial

Mem."), at 30.)  If such a right-of-way existed when the Park was created in 1964, then it is one

of the "valid existing rights" to which the creation of the Park and the Park Service's jurisdiction

and control were expressly made subject by Congress.  The "Park Service's authority to regulate

and manage use of rights-of-way, *see United States v. Garfield County*, 122 F. Supp. 2d 1201 (D.

---

[31]The original 1965 Master Plan for Canyonlands National Park expressly allowed for ongoing four-wheel-drive "Jeep" access to Salt Creek and Angel Arch.  (*See* PX-44, at 10; Findings of Fact, *infra*, ¶ 79.)

[32]Indeed, "the holder of an R.S. 2477 right of way across federal land must consult with the appropriate federal land management agency before it undertakes any improvements to an R.S. 2477 right of way beyond routine maintenance."  *SUWA*, 425 F.3d at 745.

Utah 2000)," (*id.*), does not comprehend the authority to manage valid R.S. 2477 rights-of-way out of existence. *Cf. SUWA*, 425 F.3d at 748 ("The agency may not use its authority . . . to impair the rights of the holder of the R.S. 2477 right of way.")

The United States points out that the Park Service closed a portion of the historic Salt Creek access route northeast of Cave Spring to vehicle access as early as 1969, closed the upper portion of Salt Creek Canyon in 1973, and it proposed closing Salt Creek Canyon to vehicle access above the junction with Angel Arch Canyon as early as 1977[33] (though the latter closure was not implemented until 1995[34]). The United States argues that these closures and proposed closures put the plaintiffs on notice of the United States' "exclusive ownership, jurisdiction and control of the Canyon, including the claimed road," and that these "open and notorious actions" were adverse to any asserted R.S. 2477 right-of-way in the entire Salt Creek drainage—all more than twelve years before the commencement of this action in 2004.[35] Yet during that same period, the plaintiffs' claimed right-of-way from Cave Spring to Angel Arch remained open to

---

[33](*See* DX-196, at 21, 31, 56 (Canyonlands National Park – Assessment of Alternatives (August 1977); Transcript of Trial, dated Sept. 18, 2009, at 33:25-34:15 (testimony of Kate Cannon).)

[34](*See* DX-201, at 13 (Backcountry Management Plan (January 6, 1995).)

[35](U.S. Trial Mem. at 19-20, 29-30.) "In addition," the Park Service has 'carried out substantial investments in the construction, repair and maintenance of the portions of the Salt Creek four-wheel drive route that the Park has allowed to remain open to vehicular use," in contrast to San Juan County and the State of Utah, which "have had no presence in Salt Creek Canyon since establishment of Canyonlands National Park in 1964—or at any date prior to that. Neither the County, nor the State, have ever carried out any construction, improvement, repair or maintenance of the route." (*Id.* at 19.)

motor vehicle travel.[36]  Vehicle traffic in Salt Creek Canyon was subsequently limited by

implementation of the Park Service's gate and permit system prescribed by the 1995 Backcountry

Management Plan, but public access to Angel Arch by motor vehicle was still allowed under that

system.  (Tr. 9/23/09am, at 27:25-28:11 (testimony of Philip R. Brueck); (Transcript of Trial,

dated Sept. 17, 2009 p.m. session ("9/17/09pm"), at 114:17-22 (testimony of Lynn Stevens)

("San Juan County had no objection to having permitted access to the road through the history of

that road. When it was metered down to ten Jeeps a day, that did not deny public access to Angel

Arch, and we had no objection to this.").

   While the possible closure to motor vehicle access of portions of the plaintiffs' claimed

R.S. 2477 right-of-way was considered as a management alternative by Park Service officials for

several years, the Park Service did not actually close the Salt Creek route to motor vehicle access

beyond Peekaboo Spring until 1998, when it was ordered to do so by a federal district court

injunction.  That order was subsequently vacated on appeal in 2000, and at that point, the Park

Service relied upon its administrative authority to keep the route closed beyond Peekaboo Spring

---

[36](*See* DX-197 (1978 General Management Plan).) The defendants concede that "in 1974,
the Park Service cherry-stemmed the Salt Creek four-wheel drive route out of the area
recommended for wilderness designation," (*id.* at 9), meaning that the path of the route was
specifically excluded from the land delineated for wilderness study.  (*See* Transcript of Trial,
dated Sept. 23, 2009 Morning Session ("Tr. 9/23/09am"), at 21:11-25:25 (testimony of Philip R.
Brueck).)  Thus, wilderness designation would not operate to limit or deny vehicle access to the
"cherry-stemmed" route, and likely would not trigger the QTA limitations period.  *Cf. Southwest
Four Wheel Drive Ass'n v. Bureau of Land Management*, 271 F. Supp. 2d 1308, 1312 (D.N.M.
2003) (ruling that the designation of a Wilderness Study Area encompassing claimed R.S. 2477
rights-of-way put plaintiffs and the public on notice, as of the date of publication of the WSA
designation, "that BLM claimed all the area and did not recognize any alleged rights-of-way,"
thus triggering the QTA's twelve-year statute of limitations), *aff'd on other grounds*, 363 F. 3d
1069 (10th Cir. 2004).  In any event, Congress did not act upon the 1974 wilderness
recommendation.  (Tr. 9/23/09am, at 25:5-8 (testimony of Philip R. Brueck).)

on an interim basis while it studied management alternatives and issued an environmental

assessment examining the question of continued motor vehicle access.[37]   The preferred

alternative identified by the environmental assessment was closure of Salt Creek Canyon to

motor vehicles beyond Peekaboo Spring, and as recounted above, the Park Service implemented

that closure through promulgation of a final rule on June 14, 2004, and maintaining a gate near

Peekaboo Spring to effect this closure.   *See Southern Utah Wilderness Alliance v. Dabney*, 387 F.

Supp. 2d at 1184-85.[38]   The notice accompanying the final rulemaking (DX-204) reflected the

Park Service's conclusion that the plaintiffs held no R.S. 2477 right-of-way: "[I]t has not been

shown that a valid right-of-way was constructed during the period when the lands were

unreserved.   Promulgation of this rule will not affect the ability of the County or State to pursue

in an appropriate forum the claim that this is a valid R.S. 2477 right-of-way."   69 Fed. Reg. at

32,872.[39]   "Should it be subsequently determined that the State and/or County do hold a valid

---

[37](*See* DX-202 (Environmental Assessment – Middle Salt Creek Canyon Access Plan
(June 2002).)

[38]

> The proposed rule was published in the Federal Register on August 11, 2003, for
> public review and comment.   The NPS received comments on the proposed rule
> from over 2800 individuals and 25 organizations. The comments were generally
> similar to those previously submitted on the EA (which prompted over 7000
> comment letters). The majority (over 97 percent) of the commenters supported the
> proposed rule. Of this 97 percent, nearly 95 percent sent letters with wording
> similar to that suggested by constituency groups. Of the less than 3 percent of
> commenters that did not support the rule, approximately one-third sent letters with
> wording similar to that suggested by constituency groups. . . .

*Id.* at 32872-73.

[39]Even after the June 2004 final rule, the Salt Creek road between Cave Spring and
Peekaboo Spring—part of the plaintiffs' claimed R.S. 2477 right-of-way—still remained open to
(continued...)

R.S. 2477 right-of-way, the regulation will be revisited to ensure that it is consistent with the rights associated with such a right-of-way." *Id.* at 32,873.[40]

The Park Service's June 2004 final rulemaking clearly left no doubt that the agency claimed an interest adverse to the plaintiffs' claimed R.S. 2477 right-of-way, and the plaintiffs responded by commencing this action immediately thereafter. But from the record in this case, it appears that the parties had already squared off as adversaries concerning the claimed R.S. 2477 right-of-way no later than December of 2000, after the Park Service decided to continue the closure of the Salt Creek road at Peekaboo Spring even though the injunction that initiated that closure had been vacated on appeal, *see Southern Utah Wilderness Alliance v. Dabney*, 222 F.3d 819, 829 (10th Cir. 2000). That San Juan County was by then well aware of the Park Service's adverse position was borne out by the fact that the San Juan County Sheriff, a deputy, and at least two county employees entered the park in December 2000 for the express purpose of opening the Salt Creek road to motor vehicle travel at the gate near Peekaboo Spring.[41] At the gate, the deputy removed the lock and chain from the gate,

> And then both he and the sheriff cut the wires. We had "Road Closed" signs attached to the gate, that gate in question. They cut those signs off. Then Sheriff

---

[39](...continued)
motor vehicle access, and remains so today, subject to the restrictions imposed by the Park Service's permit system. Under the permit system, vehicle day use and camping numbers were greater in 2001 than it was in 1997, prior to the closure of the route near Peekaboo Spring. (*See* Tr. 9/23/09am, at 45:15-47:23 (testimony of Philip R. Brueck); DX-202, at 48.)

[40]Clearly, at the time the Final Rule was promulgated in 2004, the Park Service was not asserting that the plaintiffs' opportunity to vindicate their R.S. 2477 claim had already expired, effectively extinguishing that claim.

[41]Transcript of Trial, dated September 22, 2009, at 74:21-78:24 (testimony of Ernest Fred Patton).)

Lacy went up -- and we also had some sawhorse type of barricades further beyond that with "Road Closed" signs on those. They removed those signs and moved the barricades to the side. And then the sheriff announced that the road was open.[42]

Four county employees in two vehicles returned to the park a week later for the same purpose, again opened the gate near Peekaboo Spring and proceeded up Salt Creek Canyon, reportedly reaching Angel Arch.[43]

Without doubt, the twelve-year QTA limitations period was already running when these events transpired. That period may indeed have commenced to run upon the implementation of the 1995 Backcountry Management Plan, which limited motor vehicle access to Salt Creek Canyon and Angel Arch. Either way, the commencement of this action on June 14, 2004 falls well within the operative twelve-year QTA limitations period, and thus this court concludes that the filing of San Juan County's complaint was timely.[44]

**FINDINGS OF FACT**

In this case, as in most cases, the existence of an R.S. 2477 right-of-way cannot be determined simply by referring to federal public land records or by a trip to the county recorder's office. What "acts on the part of the grantee" prove to be "sufficient to manifest an intent to accept" R.S. 2477's grant of a public highway right-of-way? This question must be resolved by

---

[42](*Id.* at 79:1-10.)

[43](*Id.* at 81:19-85:21.)

[44]The court likewise finds and concludes that the State of Utah's "Intervenor's Complaint to Quiet Title," filed April 22, 2005 (dkt. no. 63), was timely under the twelve-year QTA limitations period. This court does not decide whether the seven-year limitations period prescribed by Utah Code Ann. § 78B-2-201 (2008) applies to the State of Utah's claim in this case. Though asserted in the defendants' trial memorandum, (U.S. Trial Mem. at 45-47), this issue was *not* preserved for trial in the Final Pretrial Order. (*See* FPO at 25-27.)

turning to the *facts*.  The decisive facts prove to be overwhelmingly historical—to be gleaned from maps, photographs, surveys, as well as the written and oral history of the relevant landscape.   Based upon the evidence duly admitted during the trial of this action without a jury, this court makes the following findings of fact pursuant to Fed. R. Civ. P. 52(a)(1):

### Canyonlands, Salt Creek Canyon & Plaintiffs' Claimed Right-of-Way

1.  Canyonlands National Park is divided into three distinct geographical districts separated by the Green and Colorado Rivers. Relevant here is the Needles District which is located to the east and southeast of the Colorado River.  (*See* Transcript of Trial, dated Sept. 18, 2009 ("Tr. 9/18/09"), at 10:6-11:15 (testimony of Kate Cannon).)

2.  Salt Creek Canyon is the largest drainage in the Needles District and is located in a remote part of southeastern Utah, approximately fifty miles from the nearest town, Monticello, Utah. Salt Creek itself originates on the north side of the Abajo Mountains in the Manti-LaSal National Forest, about five miles from the southern boundary of Canyonlands National Park.[45] From this boundary, Salt Creek runs in a northerly direction about thirty-two miles to the Colorado River.  (*Id.* at 13:1-14:4.)  Salt Creek serves as drainage for a watershed spanning approximately 104 square miles.  (*Id.* at 14:5-20.)[46]

---

[45] A number of facts remain uncontroverted in this proceeding, including these.  (*See* FPO at 13 ¶ 11 (uncontroverted facts); *id.* at 11-20 ¶¶ 1-52 (same).)

[46] Kate Cannon, Superintendent of the National Park Service's Southeast Utah Group testified that "There is always some water in Salt Creek."

It's like a long oasis in the desert.  It's rich with wildlife of all kinds.  We've got bear and mountain lion and bobcat, coyote, elk, deer, all kinds of small mammals, abundant birds. More bird species in the Salt Creek drainage than anywhere else in the Needles and probably anywhere else in the park.

(continued...)

3. "Salt Creek and Horse Canyons compose the majority of the Salt Creek Archeological District. Salt Creek is the only year-round, fresh water creek in the Park other than the Colorado and Green Rivers." *Southern Utah Wilderness Alliance v. Dabney*, 7 F. Supp. 2d at1207.

4. There are at least 570 documented archeological sites in the Salt Creek Archeological District. (Transcript of Trial, dated Sept. 22, 2009 ("Tr. 9/22/09"), at 199:17-23 (testimony of Christine Goetze); *see* DX-240; DX-202 (p. 80).)

5. The plaintiffs' claimed "Salt Creek road" is a four-wheel drive trail which traverses the main Salt Creek Canyon and portions of the East Fork of the Salt Creek Canyon. It crosses lands located entirely within both the exterior boundaries of Canyonlands National Park and San Juan County, Utah. The plaintiffs' claimed right-of-way does not extend into the West Fork of the Salt Creek Canyon; nor does it embrace the full length of the historic Salt Creek trail extending beyond Cave Spring to the north.[47]

6. The lands underlying the plaintiffs' claimed Salt Creek road lie within Townships 30, 30½ and 31 South, Ranges 19 and 20 East, Salt Lake Base & Meridian ("SLB&M").[48] The

---

[46](...continued)
(Tr. 9/18/09, at 14:24-15:16.)

[47]The plaintiffs' claimed Salt Creek road was previously accessible from the north by way of a road that branched to the southwest off of an old entrance road at a location approximately one-half mile east of the point where that old road crossed Salt Creek. After the Park Service closed this historic Salt Creek access road to vehicle access in late 1968 or early 1969, vehicle access to Salt Creek was available only from the west over the Cave Spring road. (Tr. 9/18/09, at 59:19-60:20 (testimony of Kate Cannon).)

[48]Some of the lands traversed by the the plaintiffs' claimed right-of-way remain unsurveyed and are therefore not capable of precise description by section and aliquot part, or by
(continued...)

claimed right-of-way commences in the N1/2 of Section 29, Township 30 South, Range 20 East, SLB&M, at its junction with the Cave Spring Road, and proceeds in a southerly direction 12.26 miles, more or less, to a flat slickrock area near Angel Arch in unsurveyed Township 31 South, Range 20 East, SLB&M.[49]

7.  The plaintiffs' claimed Salt Creek right-of-way commences at an intersection of a road near Cave Spring and travels south roughly one-half mile to a gate through which National Park Service regulates vehicle access to the remainder of Salt Creek Canyon ("Permit Gate").  From the Permit Gate, the claimed Salt Creek road continues roughly three (3) miles south through the bottom of the Salt Creek Canyon to a feature known as Peekaboo Spring, where the Park Service maintains a small campground and related facilities.  From Peekaboo Spring, the claimed Salt Creek road travels south a distance of approximately seven-and-one-half (7.5) miles up from the mouth of Salt Creek Canyon to a junction with Angel Arch Canyon.[50]

---

[48](...continued)
workable metes and bounds calls along the entire course.

[49]San Juan County road personnel collected mapping-grade global positioning system ("GPS") data describing the location and course of the plaintiffs' claimed Salt Creek right-of-way.  Plaintiffs prepared an overlay map using this GPS data to depict the location and course of that claimed right-of-way, which was attached to both San Juan County's Second Amended Complaint and the State's Amended Complaint as "Exhibit 1."  The print-out of the GPS data of the center line location and course of the claimed right-of-way was attached to plaintiffs' Complaints as Exhibit 2.  Both Exhibits 1 and 2 were annexed to the Pretrial Order as "Appendix A," and were received into evidence at trial as "Plaintiffs' Exhibit 2."

The approximate distances referenced in the Pretrial Order and Appendix A, as well as the pleadings and memoranda filed herein, do not supersede the precise measurements on the ground as reflected in the GPS data—data of a kind which was verified as being 99.7 percent accurate.  (*See* Transcript of Trial, dated Sept. 15, 2009 Morning Session ("Tr. 9/15/09am"), at 8:18-11:2 (testimony of David Bronson).)

[50]Beyond the Salt Creek Canyon's junction with Angel Arch Canyon, a foot trail
(continued...)

8. From the entrance to Angel Arch Canyon, the claimed Salt Creek right-of-way extends southeasterly approximately one-and-one-third (1.3) miles, ending at a flat slickrock area approximately 300 yards from Angel Arch itself. (The plaintiffs' claimed right-of-way is depicted on several map exhibits, *e.g.*, PX-1a (large format), PX-2, PX-35, PX-37 ("jeep trail"), PX-43.)

9. The plaintiffs' claimed Salt Creek road is the only practical means by which a motor vehicle could travel from roads in the State of Utah and San Juan County directly to Angel Arch. *See Southern Utah Wilderness Alliance v. Dabney*, 7 F. Supp. 2d at 1207.

**Historic Access to Salt Creek Canyon & Angel Arch**

10. In the late 1880's or early 1890's, Rensselaer Lee Kirk built Kirk's Cabin in the upper Salt Creek Canyon, several miles south of the junction of Salt Creek Canyon and Angel Arch Canyon. (FPO at 17 ¶ 29 (uncontroverted facts).)

11. The historic Kirk's Cabin Complex includes: Kirk's Cabin, Kirk's Corral, Kirk's Fence and Kirk's Second Corral. (*See* PX-3 (photo).) The Kirks' Cabin Complex is listed on the National Registry of Historic Places. (*See* PX-49, PX-50, PX-51.)

12. Cadastral notes from a 1911 survey observed that one L. Peachman had been occupying the Kirk's Cabin site, using 80 acres of meadowland as a pasture. (Transcript of Trial,

---

[50](...continued)
continues approximately four-and-one-half (4.5) miles to the Upper Jump, a geographic feature where the stream bed abruptly changes— "jumps" —in gradient. Beyond the Upper Jump, the foot trail continues another twelve miles to the Park's southern boundary. Portions of the foot trail from the Salt Creek Canyon's junction with Angel Arch Canyon to the Upper Jump were previously open to four-wheel-drive vehicle access, but it is uncontroverted that prior to 1991, the Park Service closed this portion of Salt Creek Canyon to vehicle use at what is referred to as the Bates Wilson camp, located approximately one-half mile south of the junction with Angel Arch Canyon. The plaintiffs make no right-of-way claim concerning this trail in this case.

dated Sept. 14, 2009 ("Tr. 9/14/09"), at 92:16-93:24 (testimony of John Harja); PX-69.)

13. Cattlemen in the vicinity of Salt Creek Canyon and adjacent canyons drove cattle through the Salt Creek Canyon prior to the establishment of Canyonlands National Park. (*See* PX-52; Tr. 9/14/09, at 94:7-96:9 (testimony of John Harja).) J.A. Scorup came to the area in 1891 and with his brother Jim soon began herding cattle in the area, many of whom had strayed into the canyons from other herds. Years later, Scorup established his "Aristocrats" herd of purebred Hereford bulls which he kept in the Salt Creek Canyon area. (PX-52, at 19.)

14. By 1918, J.A. Scorup had become one of the leading cattlemen in Utah. (PX-52, at 15.) In 1926, Scorup joined with other area cattlemen to form the Scorup-Somerville Cattle Company, which he managed until his death in 1959. (*Id.* at 16.)

15. Shortly after the enactment of the Taylor Grazing Act (Act of June 28, 1934, ch. 865, 48 Stat. 1269), grazing permits were issued for cattle kept in the vicinity of Salt Creek, authorizing approximately 100 head per year. (Transcript of Trial, dated September 22, 2009, at 216:11-218:14 (testimony of Christine Goetze); *see* PX-52; DX-194.)

16. On January 26, 1942, Governor Herbert B. Maw executed a patent to the Scorup-Somerville Cattle Company confirming title to 80 acres of land near Kirk's Cabin in the company. (*See* PX-53.)[51]

17. Cattlemen related to the Scorup-Somerville company using Salt Creek Canyon during those years established a "cowboy camp" at a location near the junction of the East Fork and West Fork of the Salt Creek Canyon above the Upper Jump. (*See* Deposition of Rulon K.

_____

[51]In 1974, the United States commenced an action to condemn this land in the case styled *United States of America v. 80 Acres of Land, et al.*, Civil No. C 74-66 (D. Utah).

Somerville, dated March 31, 2005, at 17:25-19:10; Deposition of John Scorup, dated March 31, 2005, at 10:18-12:13.[52])

18.  Kenneth Christensen testified that he first traveled through Salt Creek Canyon in the spring of 1943, working with his father as a cowboy for the the Scorup-Somerville company for $25 a month.  (Deposition of Kenneth R. Christensen, dated March 31, 2005, at 6:8-7:1.)[53]  He recalls staying at the "cowboy camp" near the West Fork.  (*Id.* at 7:14-8:13.)  He worked for the company in the spring of 1944, 1945 and 1947 in the Salt Creek area.  (*Id.* at 8:14-25, 17:1-2.)

19.  John Scorup, a grandson of James Scorup, testified that he began herding cattle for the company in Salt Creek Canyon on horseback beginning in 1956.  (Deposition of John Scorup, dated March 31, 2005, at 7:25-8:25, 16:1-3, 42:4-43:1.)  Scorup had never seen Angel Arch, (*id.* at 7:11-13, 18:18-20),[54] but traveled from Cave Spring to Peekaboo Spring by jeep in 1957 on what he described as "a Jeep road" that appeared to have been bulldozed at points outside of the stream bed.  (*Id.* at 17:16-18:14, 19:6-20:14.)

---

[52]Stipulated excerpts of the Somerville and Scorup depositions were read into the record at trial on September 16, 2009, and this court makes reference herein to those excerpts.  A complete official trial transcript of those excerpts as read on that day is not yet available.

[53]Stipulated excerpts of the Christensen deposition were read into the record at trial on September 16, 2009, and this court makes reference herein to those excerpts.  A complete official trial transcript of those excerpts as read on that day is not yet available.

[54]Scorup testified that a company cattle foreman named Thornell had told him of visiting what became known as Angel Arch on horseback in 1948 or 1949, and returning there by jeep with his mother.  (Deposition of John Scorup, dated March 31, 2005, at 27:19-29:23.)  To the extent that this testimony was offered *to prove the truth of* Thornell's assertion that he had visited the arch at that time, upon defendants' objection, this court struck that testimony (*id.* at 29:9-10, 29:16, 29:19-21), as inadmissible hearsay.  *See* Fed. R. Evid. 801(c), 802.  The plaintiffs' asserted exception for reputation concerning personal or family history, Fed. R. Evid. 803(19), appears to be wholly inapposite.  *See* 5 *Weinstein's Federal Evidence* § 803.21 (2d ed. Joseph M. McLaughlin, ed. 2011).

20.  Scorup also made a trip moving cattle through portions of Salt Creek Canyon on horseback in the spring of 1957, 1958, the winter of 1960, the spring of 1961, 1962 and 1963, often in or near Horse Canyon.  (*Id.* at 43:2-46:17.)

**The 1950s: Canyon Exploration & the Discovery of Angel Arch**

21.  Alan D. "Tug" Wilson accompanied his father, Bates Wilson on another trip on horseback with four others in mid-March of 1950 up Salt Creek Canyon to the vicinity of Kirk's Cabin. (Transcript of Trial, dated Sept. 17, 2009 Morning Session ("9/17/09am"), at 77:20-80:25 (deposition of Alan D. Wilson); *see also* PX-47 (photo).)  Wilson observed "no evidence of any vehicle traffic in my mind, up the canyon at that time."  (*Id.* at 81:2-5.)  Yet at Cave Spring, Wilson "saw what I call 'tracks.'" (Tr. 9/17/09pm, at 35:2 (deposition of Alan D. Wilson).)

> I noticed that there was either a wagon track or a Jeep track.  The Jeep track might have been left over from Ray and Virginia Garner the previous year.  They went to Cave Spring.  They went into Horse Canyon, et cetera. They went over Elephant Hill.  But anyways, whatever it was, I saw what looked to me like a track, two parallel lines -- Roman road track, if you want.

(*Id.* at 35:9-16.)

22.  In the Spring of 1950, a troop of Boy Scouts together with Bates Wilson, then Superintendent of Arches National Monument, traveled by jeep up Salt Creek Canyon to the Upper Jump and Kirk's Cabin.  (Tr. 9/14/09, at 45:8-51:10, 66:11-68:18 (testimony of James I. Morgan).)  At least at points where it was visible, Morgan saw that the Salt Creek trail  "was a pretty well defined two track."  (*Id.* at 48:1-3.)[55]

23.     The same group, again accompanied by Bates Wilson, returned to Salt Creek

---

[55]Morgan may have seen the same two-track "Roman road" at Cave Spring that Wilson recalled seeing in March of that year.

Canyon in the Spring of 1951. (Tr. 9/14/09, at 51:11-22 (testimony of James I. Morgan).)[56]

Besides enjoying the scenery, the scouts looked for and documented the presence in Salt Creek

Canyon of "ancient stuff . . . in terms of ruins and pictographs and petroglyphs," including the

notable "All American Man" pictograph located above the confluence with Angel Arch Canyon.

(*Id.* at 53:1-24.)[57] The documentation was in aid of Bates Wilson's effort to persuade the federal

government to designate the area as a national monument or national park. (*Id.* at 50:25-51:5.)

24. Morgan, the Wilsons and the boy scouts returned to Salt Creek Canyon in the Spring

of 1952, continuing their exploration of Horse Canyon. (Tr. 9/22/09, at 131:14-21 (testimony of

Alan D. Wilson).)[58] The group did not venture upstream from the mouth of Horse Canyon on

that trip. (*Id.* at 131:22-132:6.)[59]

25. Alan Wilson recalled that in October or November of 1952, James Morgan and Bates

Wilson had obtained stereoscopic aerial photographs of Salt Creek Canyon. They studied the

photos, looking for "arches and large caves that might have ruins in them" that were as yet

---

[56]Morgan testified that the scouting group visited Angel Arch on the May *1951* trip, ostensibly following "a faint two track" with their jeeps in Angel Arch canyon to a point within 400-500 yards of the arch. (Tr. 9/14/09, at 51:11-52:20, 69:22-71:16.) This account proves to be inconsistent with Alan D. Wilson's detailed account of when and how Angel Arch was first identified by the scouting group and the manner in which the arch was first visited by them in the Spring of 1954. *See infra* ¶¶ 25-28.

[57]As Morgan explained, "The All American Man is a pictograph and he is shown with almost a round body. Half of the body is red with a little blue stripe down the middle, and white around the outside on the other half." (Tr. 9/14/09, at 53:11-14 (testimony of James I. Morgan).

[58]Wilson recalled that his father Bates Wilson "was interested in the area, having learned a little bit from Ray and Virginia Garner, who had gone there in 1949." (Tr. 9/22/09, at 129:23-130:1 (testimony of Alan D. Wilson).)

[59]Alan Wilson testified that the scouting group did not visit Angel Arch on the May 1951 and May 1952 trips because "Angel Arch was not known at that time." (Tr. 9/22/09, at 132:9.)

unmapped.  (*Id.* at 132:10-133:8; *see* PX-63, PX-63-a, PX-63-b, PX-63-c.)  Wilson testified to locating a previously unidentified arch in the aerial photographs:

> One of the things I found--at least I believe we found--was Angel Arch.  By studying the two images without a viewer, we were able to what we thought was a spec of light on either a pinnacle or light coming through an arch.  And we were pretty good at that.  And it turned out that was later . . . known as Angel Arch.

(*Id.* at 133:12-18.)

26.  The boy scouts returned to Salt Creek Canyon in 1953, again exploring Horse Canyon.  (Tr. 9/14/09, at 54:21-24 (testimony of James I. Morgan).)  Morgan recalled that they traveled up Salt Creek Canyon to get water near the Upper Jump, and Morgan noticed that someone had apparently pulled an old camp trailer to that site, evidently using a small bulldozer.  (Tr. 9/14/09, at 55:18-56:13, 71:21-74:9; *see* PX-5 (photograph of trailer).)[60]

27.  According to Alan Wilson, based upon the examination of the aerial photos of the Salt Creek area, the group had planned to find the unmapped arch on the 1953 trip, as they were looking for arches, pinnacles and Indian ruins.  But Alan Wilson became ill with measles and had to be extracted from Horse Canyon.  (Tr. 9/22/09, at 133:22-134:12.)  The group aborted their plan to find the arch as their final destination, visiting Lost Canyon instead.  (*Id.* at 134:5-136:8.)  Bates Wilson directed two people from California driving a Dodge Power Wagon to look for the arch in a specific side canyon.  They did so, and found the arch:

> They took a picture and sent it [to] my father.  My father sent it to his lawyer cousin, Bob Dechert, and the name Angel Arch had come about.  And those

---

[60]Morgan's recollection proves to be inconsistent with Alan Wilson's account.  Wilson testified that the camp trailer depicted in PX-5 "was not there in 1954.  I don't believe it was there in my '55 outing.  It was there in '56."  (Tr. 9/22/09, at 144:19-21.)  Wilson's account is key here because Wilson himself took the photograph that is PX-5. (*Id.* at 143:17-25; *see id.* at 144:13-145:4.)

people published an article how I found or how I photographed Angel Arch or how I named Angel Arch. Arizona Highways, maybe, something. I have a copy of that article.

Transcript of Trial, dated Sept. 17, 2009 Morning Session ("Tr. 9/17/09am"), at 94:11-25 (deposition of Alan D. Wilson); *see* Tr. 9/22/09, at 180:6-23 (testimony of Alan D. Wilson) (article about Angel Arch published in *Western Gateways*).)

28. Alan Wilson and other scouts returned to Salt Creek in May of 1954, camping near Angel Arch Canyon at what became known as the Bates Wilson campsite. (Tr. 9/17/09am, at 97:9-99:9 (deposition of Alan D. Wilson).) For the first time, Wilson's group visited Angel Arch, hiking to the arch from Salt Creek Canyon without attempting to drive their jeeps or forge a vehicle path to the arch. (Tr. 9/22/09, at 137:16-139:11 (testimony of Alan D. Wilson).)

29. At that time, Wilson did not see any evidence that vehicles had been traveling up the side canyon to Angel Arch. (*Id.* at 139:12-22.) Indeed, during his trips up Salt Creek Canyon in the 1950s, Wilson did not drive his jeep or see anyone else drive a jeep in Angel Arch Canyon. (*Id.* at 155:9-18.)

30. Samuel J. Taylor recalled first traveling up Salt Creek Canyon to the Upper Jump in May or June of 1953 with an archeological group from the University of Utah, Bates Wilson and a number of Boy Scouts. (Tr. 9/17/09am, at 46:25-48:20, 49:25-51:13 (deposition of Samuel J. Taylor).)[61]

_____

[61]Taylor also recalled that his 1953 group "took daily jaunts" from their camp near Cave Springs, "one of which was to Angel Arch"; according to Taylor, they "jeeped clear up Angel Canyon to just under the arch, and then hiked from there up to the overlook." (Tr. 9/17/09am, at 47:16-18, 48:8-15.) In this respect, Taylor's account appears to be inconsistent with Wilson's, assuming the two were part of the same scouting group in May-June 1953. (*Cf.* Tr. 9/17/09am, at 93:22-97:8 (deposition of Alan D. Wilson) (describing 1953 trip, including "Jess Jennings . . .

(continued...)

31. Taylor observed that most of the route up Salt Creek Canyon was in the sandy stream bed, but that at "a half dozen places where it gets out of the stream bed and shortcuts around the bend somebody cut an awful lot of willows." (*Id.* at 51:16-25, 52:6-22.)[62] He also noticed "mining location stakes everywhere," more in the vicinity of Cave Springs, but didn't "think there was any uranium ore discovered in the Salt Creek perimeter." (*Id.* at 53:23- 54:11.)

32. In 1956,[63] Alan Wilson, Bates Wilson and guests from the National Geographic Society toured Horse Canyon and Salt Creek Canyon by jeep, then visiting Angel Arch and Kirk's Cabin, among other features. (Tr. 9/17/09am, at 103:16-104:3, 104:22-108:18; Tr. 9/22/09, at 141:25-143:16.)[64] The group traveled from the Bates Wilson campsite to Angel Arch on horseback. (Tr. 9/22/09, at 142:12-24; Tr. 9/17/09am, at 97:9-99:9 (deposition of Alan D. Wilson).) That trip and a second one five years later became the subject of an article published

---

[61](...continued)
from the University of Utah Archaeology Department").) Wilson conceded that because of his illness, he was not with the 1953 group for their entire visit to Salt Creek Canyon, but he did not recall Bates Wilson or anyone else saying they had traveled to Angel Arch during the remainder of the 1953 trip. (Tr. 9/22/09, at 135:19-136:8, 179:22-180:5 (testimony of Alan D. Wilson).)

[62]Albert Steele testified that during the 1950s, cattle grazing in Salt Creek Canyon kept willows and other vegetation "a lot more cropped than it is at this time now." (Deposition of Albert Steele, dated March 31, 2005 ("Steele Dep."), at 45:12-46:10. Stipulated excerpts of this deposition were read into the record at trial on September 16, 2009, and this court makes reference herein to those excerpts. A complete official trial transcript of those excerpts as read on that day is not yet available.)

[63]Wilson, Morgan and others visited the meadows area near Kirk's Cabin in 1955, but traveled there from Cathedral Butte down what was called the Bull Trail, and did not travel up Salt Creek Canyon on that trip. (Tr. 9/17/09am, at 102:7-15 (deposition of Alan D. Wilson).)

[64]On the 1956 National Geographic trip, Alan Wilson took the photograph of the old trailer near the Upper Jump that was introduced at trial as PX-5. (Tr. 9/17/09am, at 108:14-109:23 (deposition of Alan D. Wilson).) Wilson identified the person in the photograph as Harlan Bennett, a member of the 1956 tour group. (*Id.*)

in *National Geographic* magazine by W. Robert Moore, "Cities of Stone in Utah's Canyonland." (PX-26.)

33. Kent Frost began driving visitors up Salt Creek Canyon by four-wheel-drive jeep to Angel Arch and other sites in 1956, having found Angel Arch by hiking in the canyon, probably in 1955. (Transcript of Trial, dated Sept. 15, 2009, p.m. session ("9/15/09pm"), at 52:16-53:9, 53:13-55:2, 86:21-87:23 (deposition of Kent Frost).) Frost began operating his commercial Canyonlands tour business in 1958. (*Id.* at 104:8-10.)

34. James Morgan and others drove up to Cathedral Butte by jeep in 1957 using a route through the Dugout Ranch, and again traveled up Salt Creek Canyon in 1959; Morgan observed one other vehicle in the canyon at the same time. (Tr. 9/14/09, at 56:18-60:11, 74:10-75:8 (testimony of James I. Morgan).)

35. Morgan observed little change in the route through Salt Creek Canyon between his trips in the1950s and his later visits to the area in the late 1990s: "there is a lot of that canyon that is narrow enough . . . that you're not going to be moving the road around a whole lot in there." (*Id.* at 61:12-14.)

36. John Scorup testified that in 1957, "we were moving a bunch of cows down the canyon one day and ran into a whole flock of Boy Scouts hiking up the canyon . . . going up to see Angel Arch and the All American Man . . ." (Deposition of John Scorup, dated March 31, 2005, at 33:10-18.)

37. In 1957, Scorup observed the road in Salt Creek Canyon beginning at the confluence of the East and West Forks and continuing down the canyon to Peekaboo Spring, with some evidence of blading and "an old Caterpillar track right at the confluence." (*Id.* at 50:12-51:18.)

38.  Albert Steele testified that he first traveled through Salt Creek Canyon in 1958 in search of some missing bulls, and that he observed some evidence of bulldozer blading at points in Salt Creek Canyon approximating twenty-five percent of the route, and particularly on the west side of the Upper Jump, which remained evident years later.  (Tr. 9/17/09am, at 25:25-27:15, 38:24-39:24, 44:4-10 (deposition of Albert Steele).)[65]

39.  On at least twenty-five subsequent trips to the Upper Jump between 1958 and 1962,[66] Steele observed more recreational activity in Salt Creek Canyon because Angel Arch became "a well-known destination;" Kent Frost and Mitch Williams began running commercial tour trips to Angel Arch at that time.  (*Id.* at 24:24-25:24.)[67]

40.  Beginning in 1959 or 1960, Rulon Somerville began driving by jeep through Salt Creek Canyon to Angel Arch or the Upper Jump, and at that time, "the road would resemble like a wagon trail.  A wagon road.  It was narrow, in and out of the water all the way . . . ." (Deposition of Rulon K. Somerville, dated March 31, 2005, at 11:12-18.)  Mr. Somerville found it an easy road to travel. And you could zoom right along in a Jeep . . . going ten, 15 miles an hour."  (*Id.* at 11:21-23.)[68]  From Cave Spring to Angel Arch, Somerville was driving in water "a

---

[65]Steele first visited Angel Arch on horseback in 1959.  (Steele Dep. at 21:19-25.)  He returned there with some frequency because he had set traps in what became known as Angel Arch Canyon.  (*Id.* at 22:1-17.)

[66](*See* Steele Dep. at 8:21-9:22.)

[67]Prior to 1962, Steele observed "very few" jeeps or other vehicles traveling up Salt Creek Canyon: "Every once in a while you ran into somebody now and again.".  (Steele Dep. at 18:8-15.)

[68]Somerville also recalled having to get out and use a shovel, often to "dig out a track on the upside on a steep – steep bank so your Jeep would not overturn because of the water had

(continued...)

little more than half the time," and south of Peekaboo Spring going up Salt Creek Canyon, it was

"wet all the way . . . [e]xcept on the oxbows and places where the road went out of the channel."

(*Id.* at 14:8-15:5.)  On that portion of the route, "the stream channel was the road in a good share

of it.  That was the road."  (*Id.* at 33:1-16.)

41.  Somerville saw evidence of bulldozer work along the Salt Creek road from Peekaboo

Spring to the junction with Angel Arch Canyon (a/k/a Cottonwood Canyon), but not in Angel

Arch Canyon itself.  (*Id.* at 16:17-21, 43:13-16.)[69]

42.  When Somerville traveled Salt Creek Canyon between 1959-60 and 1962, he did not

recall seeing any other vehicles along the route "[b]ecause people – there wasn't very many

people out there them days."  (*Id.* at 19:19-20:2.)

43.  Kenneth Christensen recalled driving his father's Jeep into Salt Creek Canyon

---

[68](...continued)
washed out that portion of the road [creating] a cut bank . . . ."  (Deposition of Rulon K.
Somerville, dated March 31, 2005, at 20:9-21; *see id.* at 35:10-12 ("You know, it might not be
shoveling.  It might be rolling rocks or something just so you keep going . . . .").)  Alan Tug"
Wilson described the tools he would carry on a drive through Salt Creek Canyon:

> Was it common to have to use tools to make your way up the canyon or back
> down?
>
> A. We use a double bit ax, very sharp one, and a pick, and a shovel.
>
> Q. And did you periodically have occasion to utilize those tools to make passage
> possible?
>
> A. Frequently.

(Tr. 9/22/09, at 161:11-17.)

[69]Somerville also saw evidence of bulldozer work beyond the junction with Angel Arch
Canyon, extending to the confluence of the East and West Forks and on to the Upper Jump.  (*Id.*
at 34:10-22.)

several times between 1959 and 1962, visiting Angel Arch six or seven times. (Deposition of Kenneth R. Christensen, dated March 31, 2005, at 11:18-12:22, 15:19-23.) He recalled seeing "one or two" other Jeeps in the canyon in 1959: "I remember pulling people out of the quicksand." (*Id.* at 23:18-24:11.) He did not recall seeing trucks or other equipment in the canyon. (*Id.* 24:19-25.)

44. Kent Frost testified that he regularly drove jeeps transporting tourists through Salt Creek Canyon from 1956 through 1964. (*See* Transcript of Trial, dated Sept. 15, 2009 (p.m. session) ("Tr. 9/15/09(pm)"), at 38:9-44:24 (reading of deposition testimony).)

45. Kent Frost noted that on June 8, 1962, he had "'[l]eft Monticello with about 30 jeeps and 90 people and drove up Salt Creek to Angel Arch . . . .'" (Transcript of Trial, dated Sept. 15, 2009 p.m. session ( 9/15/09pm, at 83:10–14 (deposition of Kent Frost); *see also* PX-23; PX-24 (contemporaneous photos of Angel Arch).)

46. Samuel Taylor noted that after that time, traffic along Salt Creek increased "especially after the park was created in '64," such that "there was just too many people up there, too much traffic on that muddy trail." (Tr. 9/17/09am, at 55:25-56:3.) According to Taylor, "the Canyonlands controversy started about 1960. Everybody wanted to see Canyonlands." (*Id.* at 58:25-59:1.)

47. Taylor observed that many people traveling up Salt Creek Canyon would get stuck in quicksand and need help to get out—including a small jeep in a group he drove with in 1957 or 1958. (*Id.* at 65:1-66:18.)

48. Seth Rigby Wright, a former San Juan County Sheriff, recalled traveling up Salt Creek Canyon to Angel Arch in 1961 or 1962 with a fifteen-vehicle search and rescue unit, and

again in 1963 sightseeing with other guests. (Transcript of Trial, dated Sept. 16, 2009 ("Tr. 9/16/09"), at 45:4-46:18 (testimony of Seth Rigby Wright).)

49. Max John Black testified that in the spring of 1962, he traveled with family members in three jeeps up Salt Creek Canyon to Angel Arch, following an identifiable path along the creek bed. (Tr. 9/16/09, at 7:18-10:11 (testimony of Max J. Black); *see* PX-32A, PX-32B (photos).) Black and his family returned to Salt Creek Canyon and Angel Arch in 1965. (*Id.* at 13:14-16:7; *see* PX-33A, PX-33B, PX-33C (photos).) Black found the path up Salt Creek Canyon to be easy to follow, picking the path of least resistance along the sandy creek bed, and had no trouble finding the way to Angel Arch. (*Id.* at 16:5-7, 27:1-8.) Black did not observe any bulldozer activity, mining equipment or activity in Salt Creek Canyon; nor did he see any other people. (*Id.* at 22:25-23:21.)

**The 1950s: Uranium Mining & Oil Exploration**

50. James Morgan did not notice any mining equipment in Salt Creek Canyon during his visits in 1957 and 1959. (Tr. 9/14/09, at 64:20-65:5, 75:18-19.)

51. In 1955, a series of location notices for mining claims in Salt Creek Canyon were recorded in San Juan County, Utah. (*See* PX-62.)

52. Albert Steele testified that he first traveled through Salt Creek Canyon in 1958, he observed some evidence of mining activity, including the portal to Lou Schmidt's mine (*see* PX-4), the old trailer near upper Jump (*see* PX-5),[70] as well as "a lot of claim stakes" a short distance above the junction with Angel Arch Canyon. (Tr. 9/17/09am, at 11:4-14:6 (deposition of Albert

---

[70]Steele recalled that between 1958 and 1960, some cowboys had moved the trailer at the Upper Jump over to Beef Basin. (Steele Dep. at 16:14-17:12.)

Steele).)[71]

53.  John Scorup first saw a uranium mine portal above Peekaboo Spring (PX-4) in 1957, ( Deposition of John Scorup, dated March 31, 2005, at 21:14-22:17.)  At that time, he saw a large compressor near the mine portal.  (*Id.* at 22:18-23:4, 23:13-19.)  He did not observe anyone at the mine or any indication that it was in operation.  (*Id.* at 57:20-58:10.)

54.  Prior to 1962, Mr. Scorup noticed a few mining claim monuments in Salt Creek Canyon, but does not recall where they were.  (*Id.* at 24:15-25.)

55.  On at least twenty-five subsequent trips to the Upper Jump between 1958 and 1962,[72] Albert Steele noticed little indication of actual mining activity in Salt Creek Canyon, which he said was "mostly done on paper."  ((Tr. 9/17/09am, at 24:7-17 (deposition of Albert Steele).)[73]

_____

[71](*See also* Steele Dep. at 5:20-6:13.)

[72](*See* Steele Dep. at 8:21-9:22.)

[73]Kent Frost confirmed that little actual uranium mining activity was conducted in Salt Creek Canyon; he recalled occasionally finding boxes of unused dynamite in Salt Creek Canyon, which he would destroy by detonating the same using bullets fired from his rifle at some distance away.  (Tr. 9/15/09pm, at 40:17-41:5, 59:1-18 (one miner "had a little notch blasted into the . . . limestone wall" near the Upper Jump); *id.* at 72:21-75:24 (identifying portal depicted in PX-4 as a uranium mine not far from Peekaboo Spring where Frost destroyed unused dynamite in 1960); *id.* at 81-18-82:9 (more dynamite destroyed in 1961); *id.* at 115:1-116:7 (no other mining activity in the canyon).   By 1960, as Frost explained:

Q.  Okay.  Was there still mining activity in the canyon?

A.  Well, no.  All [they] did was just drill a hole in the rock so they could get, oh, some kind of mining loan on it.

Q.  Okay.

A.  To develop the mine.

(continued...)

-59-

56. On fifteen trips to Angel Arch prior to April of 1962, Samuel Taylor did not see any mining or drilling equipment in Salt Creek Canyon. (Tr. 9/17/09am, at 54:12-55:11.) Nor did he see evidence of bulldozer blading in the canyon. (*Id.* at 62:3-12.)

57. Seth Rigby Wright recalled visiting Salt Creek Canyon on a hunting trip in October of 1958, and seeing what was apparently a uranium mine portal near Salt Creek approximately four miles south of Peekaboo Spring, with little or no evidence of ongoing mining activity. (Tr. 9/16/09, at 40:23-44:25 (testimony of Seth Rigby Wright); *see* PX-4 (photo).)

58. Kenneth Christensen recalled seeing the mine portal south of Peekaboo Spring (*see* PX-4), but did not see any mining equipment, mine tailings or other evidence of mining activity other than the portal itself. (Deposition of Kenneth R. Christensen, dated March 31, 2005, at 43:22-44:16.)

59. The State Line Oil and Gas Company drilled an oil well in Salt Creek Canyon approximately one mile south of Peekaboo Spring, but abandoned the well as a dry hole on

---

[73](...continued)
Q. Get financing.

A. There was hardly any trace of uranium down there. But they'd find a little bit once in a while, so that's what it amounted to.
* * * *
Q. Do you recall any mining equipment at the uranium mine . . . ?

A. Well, no. They did have a compressor up there so they could drill the holes. And that one tunnel they built back in went probably 20 feet.

Q. And there was a compressor there?

A. Yes.

(Tr. 9/15/09pm, at 75:25-76:10, 89:5-13.)

January 19, 1956.  (Tr. 9/15/09, at 71:11-74:3 (testimony of Robert E. Turri); *see* PX-71.)

60.  Pan American Petroleum Corporation drilled a similar well north of Peekaboo Spring in 1957.  (*Id.* at 75:12-76:16; *see* PX-73.)

**Surveys**

61.  The northern portion of the plaintiffs' claimed right-of-way traverses Township 30 South, Range 20 East, SLB&M.  Township 30 South, Range 20 East, SLB&M, was surveyed between September 17 and December 16, 1927, as shown by Cadastral Survey Plat for these lands, dated April 24, 1931.  (*See* PX-40.)  The internal sections of this township were surveyed. As described in the Field Notes for this survey (*see* PX-66), and as shown on the Cadastral Survey Plat, a wagon road is depicted as entering the township from the east, proceeding to Cave Spring, and thereafter traveling southwesterly from Cave Spring into an adjacent canyon known as Lost Canyon.[74]  (*Id.*)

62.  Immediately south of Township 30 South, and traversed by the plaintiffs' claimed right-of-way, lies a partial township styled Township 30½ South, Range 20 East, SLB&M. Township 30½ South, Range 20 East was surveyed from June 13 to 20, 1957, as shown by the Cadastral Survey Plat for these lands, dated October 13, 1958 (DX-178).  The surveyor of this partial township did not call or note any road crossing the north or south boundaries of Township 30½ South, Range 20 East, SLB&M.  (*See* DX-177.)

63.  Immediately south of Township 30½ South, Range 20 East, SLB&M, and traversed

---

[74]Salt Creek Canyon lies more or less directly south of Cave Spring. The wagon road depicted on the 1931 Cadastral Survey Plat is not shown as entering the Salt Creek Canyon; rather, it is shown as entering Lost Canyon.  No road is depicted on the 1931 Cadastral Survey Plat as crossing the boundaries of Township 30 South, Range 20 East into the Salt Creek Canyon.

by the plaintiffs' claimed right-of-way, lies Township 31 South, Range 20 East, SLB&M. Township 31 South, Range 20 East, SLB&M, remains largely unsurveyed as shown by Cadastral Survey Plat, dated October 13, 1958 (PX-67). However, the exterior boundaries of this township were surveyed in June of 1957. (*See* PX-68 (survey notes).)

64. Immediately south of Township 31 South, Range 20 East, SLB&M, lies Township 32 South, Range 20 East, SLB&M. Township 32 South, Range 20 East, SLB&M, was partially surveyed in 1911, as shown in the Cadastral Survey Plat dated March 28, 1914 (PX-39). (*See* PX-69 (survey notes).) Portions of this township were also surveyed in 1957. (*See* DX-181 (survey notes).)[75]

65. The plaintiffs' claimed right-of-way thus traverses Township 30 South, Township 30½ South and Township 31 South, Range 20 East, SLB&M, but does not extend into Township 32 South, Range 20 East, SLB&M. (Tr. 9/18/09, at 119:2-23 (testimony of Ted D. Stephenson).)

66. Except for calling a jeep road approximately one-quarter mile northeast of Peekaboo Spring, the claimed "route is not identified in the survey notes existing as a trail or a road" within these townships. (*Id.* at 108:2-13.) Nor does the claimed route appear in the survey plats. (*See id.* at 98:22-108:13; DX-146.5.) Where the interior of a township remained largely unsurveyed, *e.g.*, Township 21 South, Range 20 East, SLB&M, the survey teams would not have surveyed the particular sections within the township where the claimed route may be located and thus would not have had occasion to make notes reflecting its existence. (*Id.* at 120:11-122:11.)

---

[75]Though listed as PX-70, the 1957 cadastral survey plat for this township was not offered or received in evidence.

**Maps & Aerial Photographs**

67.  In 1953, the United States Geological Survey ("USGS") published The Needles, Utah, 15 Minute Quadrangle map, N3800-W10945/15, encompassing some of the lands crossed by the Salt Creek road and the Salt Creek Canyon (PX-41; DX-110). The map was based upon aerial photographs taken in 1953.  (Tr. 9/23/09am, at 58:25-59:2 (testimony of Philip R. Brueck).)

68.  In 1954, the USGS published the Harts Point, Utah, 15 Minute Quadrangle map, N3800-W10930/15, encompassing some of the lands within Salt Creek Canyon (PX-42; DX-111).  Like the Needles map, the Harts Point map was derived from 1953 aerial photographs. (Tr. 9/23/09am, at 59:15-21 (testimony of Philip R. Brueck).)

69.  Similar maps were prepared for adjoining areas using 1952 aerial photographs, *e.g.*, the Fable Valley quad (DX-112) and the Mt. Linneaus quad (DX-113).  (*Id.* at 59:22-60:24.)[76]

70.  None of these maps depict a jeep road or jeep trail in Salt Creek Canyon.  (*Id.* at 63:11-17.)

71.  Similar maps of the Needles area were prepared as "7 ½-minute quads" in 1954 and 1955, using the 1952 and 1953 aerial photographs, but showing greater detail than the 15-minute quads (DX-114, DX-115, DX-116, DX-117, DX-118, DX-119).  (*Id.* at 64:8-68:9.)

72.  None of these more detailed maps depict a jeep road or a jeep trail in Salt Creek Canyon.  (*Id.* at 68:22-69:23; *see* DX-146.2 (mosaic of 7-½ minute quad maps).)

73.  The 1953 Needles, Utah and 1954 Harts Point, Utah maps were later edited and reprinted.  The 1953 Needles, Utah, map was edited and reprinted in 1969 (PX-37; DX-120).

---

[76](*See also* DX-146.1 (mosaic of DX-110, DX-111, DX-112 & DX-113).)

The 1954 Harts Point, Utah, map was edited and reprinted in 1971 (PX-38; DX-121). (*Id.* at 70:7-71:22.)

74.    The 1969 edition of the Needles map (PX-37; DX-120) depicts a jeep trail in Salt Creek Canyon,[77] while the earlier edition (PX-41; DX-110) does not; the same appears to be true of the 1971 edition of the Harts Point map. (*Id.* at 71:23-72:4; *see id.* at 72:22-73:24; DX-146.3 (mosaic of 1969/1971 quad maps).)[78]

75.    Aerial photographs of the Needles-Salt Creek Canyon area were taken by the USGS in 1952 (PX-63a, PX-63b, PX-63c), and 1953 (PX-64a, PX-64b, PX-64c). Evan K. Lowry, a San Juan County land use planner, examined these aerial photographs, but could not verify the existence of an identifiable road in Salt Creek Canyon: "there were some points that looked like there could be a road through there, but I could not totally verify if there was." (Tr. 9/17/09pm, at 12:3-19:5 (testimony of Evan K. Lowry).) In contrast, Lowry was able to locate a road in Salt Creek Canyon in aerial photographs taken in 1975: portions of the road were clearly evident, especially where it cut across at some of the meanders.") (*Id.* at 20:3-23:20; *see* PX-65a, PX-65b, PX-1c (photos).) The same was true of an aerial photograph taken in 2009: "the road's almost easier to see in the 2009 than it is the older map because of more vegetation." (Tr. 9/17/09pm, at 86:15-89:24; *see id.* at 90:4-92:12; PX-1b (photo).)

---

[77]The court notes that PX-37 (DX-120), which is the 1969 version of the United States Geological Survey 1953 quad map of Needles, Utah, depicts the claimed Salt Creek route with a single-dashed line (----) labeled as a "jeep trail"; the map's legend indicates that an "Unimproved dirt road" would be depicted using a double-dashed line (====).

[78]Two Manti-LaSal National Forest maps prepared by the Forest Service, dated 1959 (DX-156) and 1965 (DX-157) do not depict a road in Salt Creek Canyon. (Tr. 9/23/09am, at 74:7-77:2 (testimony of Philip R. Brueck).)

76. Dr. Robert H. Webb examined aerial photographs of Salt Creek Canyon taken at various times from 1952 to 2009 (including 1952, 1953, 1966, 1976, 1993, 1995, 2002, 2006 and 2009), and found "no evidence of vehicle route from the confluence of Horse Canyon and Salt Creek up to Angel Arch Canyon and upstream on Angel Arch Canyon" in the 1952 images. (Transcript of Trial, dated Sept. 23, 2009 Afternoon Session ("Tr. 9/23/09pm"), 32:19-33:1 (testimony of Dr. Robert H. Webb); *id.* at 44:20-45:7, 49:18-21, 50:1-12, 62:15-22 (same); *see* DX-136.1, DX-136.2 (photo mosaics).)[79]  In contrast, "[t]here is a vehicle route that is apparent on the 1966 imagery," as well as subsequent images.  (*Id.* at 33:2-3; DX-136.3 (photo mosaic of 1966 images); *see* Tr. 9/23/09pm, at 50:22-58:4, 62:15-65:3 (comparing images from 1952, 1966, 1976, 1993, 1995, 2002, 2006 and 2009).)[80]  That route "has moved in some cases considerably from 1966 through 2009."  (*Id.* at 33:17-18; *see* DX-136.4 (photo mosaic of 2009 images).)

77. Based upon his examination of aerial photographs and his own photographs taken

---

[79]Dr. Webb noted that "the resolution on the 1952 images is .17 meters on the image. These resolutions are typically given in metric units, which is excellent imagery.  You can resolve all kinds of features on the ground with an image that has that kind of resolution to it." (Tr. 9/23/09pm, at 45:23-46:2.)  Given that resolution in the 1952 images, Dr. Webb believed that he "would have been able to detect the road if it was present in Salt Creek Canyon on the 1952 imagery."  (*Id.* at 50:20-21.)  On the other hand, Dr. Webb "concluded that the 1953 photographs are too low resolution to really determine anything in terms of vehicle routes."  (*Id.* at 50:5-7.)

[80]As Dr. Webb explained,

On the 1966 aerial photographs, you can find a vehicle route that is that's readily apparent on the higher terraces, namely the historic and settlement terraces, but that route has been disrupted at various points along along its way where it lies on the modern floodplain and down within the channel.

(Tr. 9/23/09pm, at 50:8-12.)

when he visited Salt Creek Canyon in November of 2008 and late April/early May of 2009 (DX-185),

> what I found was that roughly 87 percent of -- or roughly 88 percent of the distance of the vehicle route between Cave Spring road and the Angel Arch Canyon parking lot is in the channel in the modern floodplains, which are areas that are repeatedly inundated by flash floods and the road is eroded in those sections. In the remaining, roughly ten percent here is on the higher terraces where that vehicle route would be expected to be stable for the long term and about two percent of it is flowing on bedrock.

(*Id.* at 62:5-14.) Indeed, "[e]very two to five years, the vehicle route will be eroded and effectively removed where it crosses the channel and the modern floodplain, leaving it only stable up on the historic terrace and the settlement terrace." (*Id.* at 65:20-23.)

78. According to Dr. Webb, "There are a number of places in Salt Creek Canyon whereby looking at the time series of aerial photography you can see that the vehicle route is not in exactly the same place as a function of time." (*Id.* at 66:6-9; *see* 66:11-70:22.)

**Park Management Documents**

79. The 1965 Master Plan for Canyonlands National Park referred to Salt Creek as a "major route" for visitors. (PX-44, at 5 ("major routes such as Salt Creek"); Tr. 9/14/09, at 112:8-113:15 (testimony of John Harja).) It also referred to "established jeep trails" within the Park, ostensibly referring, *inter alia*, to Salt Creek, where Kent Frost offered charter four-wheel drive vehicle tours, as noted in the Plan. (PX-44, at 5 ("Accommodations And Services: Transportation"); Tr. 9/14/09, at 113:19-22.) The 1965 Master Plan explained that "[a]ccess to such features as Angel Arch, The Jump, Horse Canyon and Salt Creek will only be available by four-wheel drive vehicles of by horseback operating along the stream beds." (PX-44, at 10 ("Circulation"); Tr. 9/14/09, at 115:13-16; *see also id.* at 113:19-116:15 (discussing 1965 Master

Plan).)

80. The Park Service's August 1977 Assessment of Management Alternatives (DX-196) examines three alternatives concerning the Salt Creek drainage. In each instance, a "Jeep road" is depicted along the route to Horse Canyon, up Salt Creek Canyon to the confluence with Angel Arch Canyon and extending to Angel Arch. (*See* Tr. 9/18/09, at 66:12- 68:22 (testimony of Kate Cannon); DX-196, at 49-51.)

81. Regular, even frequent public use of the Salt Creek route to visit Angel Arch was acknowledged in subsequent Park planning documents, such as the May 1978 Gemeral Management Plan (DX-197), and the September 1989 Backcountry Management Plan (DX-199, at 19, 22).[81]

82. The January 1995 Backcountry Management Plan (DX-201) addressed "four-wheel drive roads in the Needles District," limiting—for the first time—the volume of vehicular traffic under a permit system allowing ten private and two commercial vehicles on Salt Creek per day, and closing Salt Creek Canyon to motor vehicle access above the "junction with the Angel Arch spur road." (DX-201, at 13; *see* Tr. 9/22/09, at 32:22-43:3 (testimony of Ernest Fred Patton).).)

**Construction, Maintenance & Repair**

83. It remains uncontroverted that neither San Juan County or the State of Utah has performed any construction, maintenance or repair work within the claimed Salt Creek road to keep the route accessible by motor vehicles. (*See* FPO at 20 ¶ 52 (uncontroverted facts).)

---

[81]The 1989 Plan classified the "Salt Creek Road," "Angel Arch Camp," and "Bates Wilson Camp" as "V-1," representing "maximum facilities and the greatest probability of of contact with other users." (DX-199, at 21, 22; see Tr. 9/22/09, at 28:17-31:22 (testimony of Ernest Fred Patton).) According to Mr. Patton, it was understood that "a road up Salt Creek" predated the creation of the Park. (Tr. 9/22/09, at 113:15-23.)

84. Construction, maintenance and repair of both paved and unpaved roads within Canyonlands National Park are performed by the National Park Service. (Tr. 9/18/09, at 12:15-25 (testimony of Kate Cannon).)

85. Any maintenance or repair work performed using equipment within the claimed Salt Creek road since the creation of Canyonlands National Park has been undertaken by or at the direction of the Park Service. (*Id.* at 49:6-50:12, 56:21-59:14, 65:18-66:11; *see also* DX-230.1-230.6 (photographs).)[82]

86. As Park Superintendent Kate Cannon explained, the agency must restore the vehicle-accessible portion of the road after it has been rendered impassable by the recurring flood events that are typical of Salt Creek:

> Below Peekaboo, the management problem is that when the flood events occur, they virtually always take out the road, since they run right down the road. And then the management problem gets to be to try to put the road back into a passable condition so the people can continue to travel it.
> . . . .
> [T]ypically we'll go to the site. We'll haul our backhoe to the site on a lowboy and then walk it up the creek to the trouble spot, and then use the backhoe to clear debris and to pull down banks so a route can allow vehicle passage, try to provide a passable roadway around the water holes and things that we can't repair.

(Tr. 9/18/09, at 57:15-20; *see* DX-230.1; DX-230.2.)

87. The combination of persistent streamflow, recurring floods and the accumulation of a

---

[82]Plaintiffs contend that the Salt Creek road was also "repaired" and "maintained" by "the public"—by visitors to the canyon who would use shovels and other hand tools to clear obstructions and make the route passable by motor vehicle at specific points along the way. (Tr. 10/9/09, at 26:15-18 (Mr. Welch).) Yet the fact that a visitor would need to shovel his or her own path through or around the Salt Creek stream bed suggests that their may not have been an actual "road" in place. *See, e.g., Merriam-Webster's Collegiate Dictionary* 270 (11th ed. 2003) (defining "road" as "an open way for vehicles, persons, and animals"); *cf.* H.R. Rep. No. 94-1163, at 17 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6175 ("A way maintained solely by the passage of vehicles does not constitute a road.").

large volume of sand and sediment often creates patches of quicksand, which have long proven challenging, even impassable to motor vehicles. (*See* Tr. 9/23/09am, at 17:21-23 (testimony of Philip R. Brueck) ("[t]here were still times when [the road] was impassable because of either quicksand or there had been a flood and there were extra deep pools . . . ."); (Tr. 9/17/09pm, at 9:25-12:12 (deposition of Alan D. Wilson) (Wilson recalled a trip through Salt Creek Canyon in the fall of 1958 when the creek flooded and quicksand formed along the route: "The canyon was total quicksand.").) Indeed, at the time of trial in mid-September 2009, the Salt Creek road was "impassable now because of quicksand, but we haven't had to go up and repair it yet." (Tr. 9/18/09, at 57:6-7 (testimony of Kate Cannon).)

88. The persistent flooding and quicksand problems result in temporary closure of the vehicle-accessible portion of the road for "[a]nywhere from a couple of days to months," and "[t]he closures that last longer tend to be because there are deep pools of water that we can't find a path across, we can't find a way around or across that's passable for motor vehicles, or they are due to expanses of quicksand." (*Id.* at 59:7, 59:11-14.)

**IS THE SALT CREEK ROAD AN R.S. 2477 HIGHWAY?**

As set forth in the Final Pretrial Order, the triable issue of fact central to this proceeding is "[w]hether the public uses of the Salt Creek road prior to the time when the lands were withdrawn or reserved" by the creation of Canyonlands National Park "was sufficient to show an acceptance of the grant of an R.S. 2477 right-of-way for the Salt Creek road" extending from Cave Spring up Salt Creek Canyon to Angel Arch. (FPO at 21 ¶ 5.a.)[83]  At closing argument,

_____

[83]The Final Pretrial Order enumerates a series of "contested issues of fact," most of which simply reiterate this core issue with varying degrees of factual specificity (FPO at 21-24 ¶¶ 5.d,

(continued...)

counsel for San Juan County stated the decisive legal standard in concise terms: "ten years of continuous public use as a thoroughfare proves the acceptance of public highway right-of-way" pursuant to R.S. 2477.[84]  *Accord SUWA*, 425 F.3d at 771, 781.[85]

This court has reviewed with some care the current R.S. 2477 interpretive framework as it was delineated by the Tenth Circuit in the *SUWA* opinion, seeking such guidance as may be gleaned from that source.  This court has also canvassed the pertinent federal and State case precedents from Utah[86] and elsewhere, examining with some care the factual footing for the court's conclusions in each case.  This court has viewed the foregoing Findings of Fact through the compound lens of the current interpretive framework, aided by such light as the case law may

---

[83](...continued)
5.f, 5.g(i)-(v), 5.h(i)-(v), 5.i(i)-(v), 5.j, 5.k, 5.l, 5.m(i)-(iii), 5.n, 5.o).  Three issues deal with the scope of the claimed R.S. 2477 right-of-way once established, (*id.* at 21 ¶¶ 5.b, 5.e, 5.r(i)-(iv)), and three deal with the defendants' QTA statute of limitations theory (*id.* at 21, 24 ¶¶ 5.c, 5.p, 5.q).

[84](Transcript of Trial, dated October 9, 2009 ("Tr. 10/9/09"), at 6:14-16 (Mr. Welch).)

[85]"The standard for acceptance of an R.S. 2477 right of way in Utah is 'continued use of the road by the public for such length of time and under such circumstances as to clearly indicate an intention on the part of the public to accept the grant.'"  *SUWA*, 425 F.3d at 781 (quoting *Lindsay Land & Live Stock Co. v. Churnos*, 75 Utah at 389, 285 P. at 648).

[86]*See, e.g.*, *Morris v. Blunt*, 49 Utah 243, 161 P. 1127, 1131 (1916); *Lindsay Land & Livestock Co. v. Churnos*, 75 Utah 384, 285 P. 646 (1929); *Sullivan v. Condas*, 76 Utah 585, 290 P. 954, 957 (1930); *Jeremy v. Bertagnole*, 101 Utah 1, 116 P.2d 420 (1941); *Oregon Short Line R. Co. v. Murray City*, 2 Utah 2d 427, 430-31, 277 P.2d 798, 800-01 (1954); *Thompson v. Nelson*, 2 Utah 2d 340, 273 P.2d 720 (1954); *Boyer v. Clark*, 7 Utah 2d 395, 326 P.2d 107 (1958); *Clark v. Erekson*, 9 Utah 2d 212, 214, 341 P.2d 424, 425 (1959); *Petersen v. Combe*, 20 Utah 2d 376, 377-78, 438 P.2d 545 546-47 (1968); *Thomson v. Condas*, 27 Utah 2d 129, 131-33, 493 P.2d 639, 641 (1972); *Heber City Corp. v. Simpson*, 942 P.2d 307, 309 (Utah 1997); *State ex rel. Div. of Forestry, Fire & State Lands v. Six Mile Ranch Co.*, 2006 UT App 104, 132 P.3d 687, 692.

shed, with some cases proving to be more analogous or helpful, others less so.

The question for this court to decide is whether the plaintiffs have proven by clear and convincing evidence the requisite public use of their claimed R.S. 2477 right-of-way as a "public thoroughfare" for the requisite length of time.

Noting that R.S. 2477 "was enacted by Congress in 1866 to assist in the development of the West by granting 'rights of way for construction of highways over public lands to miners, farmers, ranchers, and homesteaders,'"[87] counsel for San Juan County asserts that the evidence presented at trial shows use of the claimed Salt Creek road by each of these categories of users, and more.[88] On this basis, the plaintiffs assert that the "continuous public use" clock should start with the arrival of Rensselaer Lee Kirk in upper Salt Creek Canyon in the 1890s, a cattleman who moved livestock and goods up Salt Creek Canyon and homesteaded at the site now known as Kirk's Cabin.[89]

The evidence of Kirk's use of the Salt Creek route consists largely of inferences drawn from the relics—a wagon, a hay rake and the like—left behind at the Kirk's Cabin site. Very little direct evidence was presented as to how often or for how long Kirk traversed Salt Creek Canyon before abandoning the site forever.[90] A surveyor found evidence in 1911 of occupancy at

---

[87]*Southwest Four Wheel Drive v. Bureau of Land Management*, 271 F. Supp. 2d 1308, 1313 n.8 (D.N.M. 2003) (quoting Harry R. Bader, *Potential Legal Standards for Resolving the R.S. 2477 Right of Way Crisis*, 11 Pace Envtl. L. Rev. 485, 485 (1993))

[88](Tr. 10/9/09, at 5:17-24 (Mr. Welch).)

[89](*Id.* at 7:25-8:20; *see* Trial Brief of San Juan County and the State of Utah, filed August 17, 2009 (dkt. no. 118) ("Pltfs' Trial Brf."), at 6.)

[90]*Okelberry* suggests—in dictum, at least—that as to the requirement of continuous use,
(continued...)

Kirk's Cabin by another individual, "L. Peachman," but essentially nothing was shown concerning his presence in or his use of Salt Creek Canyon, or actual the duration of his stay at the Kirk's Cabin site.[91]

More evidence was presented at trial concerning the subsequent use of the upper Salt Creek Canyon area by cattle ranchers, particularly the Scorup-Somerville Cattle Company, which pastured its Aristocrat Herd of bulls near the Kirk's Cabin site and would move cattle between their winter and summer grazing areas through Salt Creek Canyon.[92]  Though the company's presence in upper Salt Creek at times during the 1920s, 1930s and 1940s was more consistent than that of Kirk or Peachman, it would strain the language to characterize its presence as a "public" use, or that Salt Creek Canyon was then being used as a "public thoroughfare."  The company had its own proprietary interests in upper Salt Creek—federal grazing permits issued after 1936, and a 1942 deed to 80 acres of land near Kirk's Cabin.  As the Tenth Circuit explains

_____

[90](...continued)
"a road may be used by only one person once a month, but if this use is as frequent as the public finds it "convenient or necessary," . . . the use is continuous.  The one-month period of time between usages is a mere intermission, not an interruption."  2008 UT 10, at ¶ 16, 179 P.3d at 774.  Of course, this example of continuity presupposes the existence of evidence of monthly use *by someone*.  In this case, there is *no* specific evidence of recurring monthly use by *anyone* during the Kirk-Peachman era.  Moreover, *Okelberry* did *not* alter a claimant's burden to "establish by clear and convincing evidence that the road at issue was continuously used as a public thoroughfare for a period of ten years,"  2008 UT 10, at ¶ 15, 179 P.3d at 774, and as noted above, *Okelberry* did not address the "public thoroughfare" requirement.

[91]The plaintiffs' reliance upon inferred events from the Kirk-Peachman era to commence the "continuous use" of their claimed R.S. 2477 right-of-way is further complicated by the fact that the Kirk's Cabin site is *not* the destination served by their claimed right-of-way.  *See SUWA*, 425 F.3d at 783-84.  Likewise, the subsequent movement of cattle to or from the meadows near the Kirk's Cabin site had nothing to do with Angel Arch as a destination.

[92]*See* Findings of Fact, *supra*, at ¶¶ 13-20.

in *SUWA*, "The decisions make clear that occasional or desultory use is not sufficient." 425 F.3d at 771. The *SUWA* panel noted that "[l]arge parts of southern Utah are crisscrossed by old mining and logging roads constructed for a particular purpose and used for a limited period of time, but not by the general public." *Id.* at 781-82.[93] In contrast, the claimed R.S. 2477 right-of-way in question in *Lindsay Land & Live Stock* was used not only by several owners for herding sheep, but by "by many and different persons for a variety of purposes":

> [T]he road connected two points between which there was occasion for considerable public travel. The road was a public convenience. When sawmills

---

[93]The Utah Supreme Court addressed a somewhat similar circumstance in *Thomson v. Condas*, 27 Utah 2d 129, 131-33, 493 P.2d 639, 641 (1972), involving a claimed "public thoroughfare"

> whose existence was established as a wagon road from 1894 to 1898 terminating at the quarry during which time its only use was by the witness Snyder's family, and those connected with the quarry. There was no evidence as to its existence from 1898 to 1915. In 1915 the lower road existed up to the quarry, but not beyond. It was washed out around the hill in the spring run-off and winter snows 'kept it pretty well gutted with little trenches.' Evidence of the existence of the road is unclear from 1915 to 1926, when its existence generally was established. When the Condas family went into the area (as prospective homesteaders) in 1925 or 1926, they bogged down in attempting to use the road. A creek alongside flooded the road half the time and the road was full of potholes, and use of the road was difficult because it was wet and marshy along the fence line. . . . At no time did the County or State ever repair or maintain the upper road, subject of the cause of action. The court further found that prior to 1931 use of the lower road was limited to intermittent private use of the quarry lessees and their employers, and by an occasional hunter or fisherman and by defendants' predecessors for sheep operations from 1928 to 1931, and thereafter by the latter in sheep operations and by a farmer immediately to the South, and that neither road was used during any period of time by the general public as a public thoroughfare, and that at all times both were used as private roadways.

27 Utah 2d at 131-32, 493 P.2d at 641. The court concluded that the evidence upon which the right-of-way claimants relied to show continuous public use "was a stranger to the clear and convincing evidence demanded in a case like this, and we so hold." 27 Utah 2d at 133, 493 P.2d at 641.

were established on or near the road, it was used, not only by those conducting the sawmills, but by many others who went to ththe period when the mining camp existed in the vicinity, the road was unquestionably used very extensively by the general public for general purposes.

75 Utah at 391, 285 P. at 648-49.[94]

"Was there sufficient evidence by competent testimony" about the company's cattle herding activity in Salt Creek Canyon "to show by clear and convincing evidence, that the public generally,– not just a few having their own special and private interests in the road, had used the road continuously for 10 years?" *Petersen v. Combe*, 20 Utah 2d 376, 377-78, 438 P.2d 545 546-47 (1968). The court concludes that on this record, there was not.[95]

---

[94]In *State ex rel. Div. of Forestry, Fire & State Lands v. Six Mile Ranch Co.*, 2006 UT App 104, 132 P.3d 687, similar facts supported a finding of continuous public use of the West Stansbury Road:

> "From 1949 until 1993, the general public used the West Stansbury Road for numerous recreational activities including picnicking, rock hunting, hiking, camping, horseback riding, mountain biking, sightseeing, cookouts, hunting, motorcycle riding, organized activities such as 'Senior Sneak Week,' Easter weekend 'egg hunts,' athletic events[,] and sunbathing. This usage of the West Stansbury Road included the use of automobiles, campers, trailers, motorcycles, all-terrain vehicles, bicycles, horses[,] and other similar items."

2006 UT App 104, at ¶ 16, 132 P.3d at 693; *see also Clark v. Erekson*, 9 Utah 2d 212, 214, 341 P.2d 424, 425 (1959) ("here was testimony by witnesses, some of whom could remember back to 1890," that the claimed right-of-way "had been used by the general public either walking or riding in wagons and later in automobiles. The road was being constantly used by people either to go to church, or to fish in Little Cottonwood Creek through which the lane passed or as a short cut north between 59th South and Vine Street.")

[95]As explained above, to say that "'[i]t is unlikely that a route used by a single entity or used only a few times would qualify as a highway, since the route must have an open public nature and uses'" is "simply a restatement of the 'continuous public use' requirement of Utah law." *SUWA*, 425 F.3d at 783. The record is devoid of evidence of "public uses" of the Salt Creek route during the 1920s, 1930s and 1940s apart from cattle herding. Absent evidence that persons other than Scorup-Somerville cowboys were traversing the Salt Creek route at that same

(continued...)

At least as to the first half of the Twentieth Century, the plaintiffs have failed to prove by clear and convincing evidence ten years of continuous public use of their claimed Salt Creek Canyon right-of-way as a public thoroughfare.[96]  Moreover, the plaintiffs have failed to establish

---

[95](...continued)
time, satisfying the "public thoroughfare" standard also becomes very difficult.  A route "becomes a 'public thoroughfare' when the public have a general right of passage. . . .  If the thoroughfare is . . . used as a private way, its use, however long, as a private way, does not make it a public way . . . ."  *Morris v. Blunt*, 49 Utah 243, 251, 161 P. 1127, 1131 (1916); *see Lindsay Land & Live Stock*, 75 Utah at 391, 285 P. at 648 ("If the claim rested alone upon the use of the road for sawmill purposes, or for mining purposes, or for the trailing of sheep, the question would be more difficult."); *Cf. Thomson v. Condas*, 27 Utah 2d 129, 131-33, 493 P.2d 639, 641 (1972) ("neither road was used during any period of time by the general public as a public thoroughfare, and that at all times both were used as private roadways.")

Cases from another jurisdiction that appear to equate sole private use with use as a public highway without more, *e.g.*, *Leach v. Manhart*, 102 Colo. 129, 133, 77 P.2d 652, 653 (1938); *Nicolas v. Grassle*, 83 Colo. 536, 267 P. 196, 197 (1928), cannot be reconciled with the Utah public thoroughfare requirement as applied to the facts in the Utah cases, such as *Morris*, *Lindsay Land & Live Stock* and *Thomson*.

[96]Relying on *Okelberry*, counsel for San Juan County argues that "continuous is not a measure of frequency . . . .  Continuous is a measure of whether the public use was interrupted," that is, intentionally obstructed by the landowner.  (Tr. 10/9/09, at 6:19-21 (Mr. Welch).)  Under this approach, it appears that once public use of a path has begun, it is deemed "continuous" unless and until that use is prevented by deliberate action of the landowner.

At least one commentary has identified a recent and fundamental shift in interpretation of the Utah highway dedication statute from emphasis upon dedicatory intent on the part of a landowner to emphasis upon prescriptive adverse use and acquiescence on the part of the landowner—a trend amplified in *Okelberry* and its companion cases.  *See* Comment, *Use Interrupted: The Complicated Evolution of Utah's Highway Dedication Doctrine*, 2008 Utah L. Rev. 1613, 1628-31.

An interpretive scheme that emphasizes public adverse use and prescriptive rights and turns upon whether "interruption" has occurred seems much less relevant to R.S. 2477, in which the landowner's dedicatory intent was explicit, leaving unresolved only the question of public *acceptance* of the statutory grant.  *See* Harry R. Bader, *Potential Legal Standards for Resolving the R.S. 2477 Right of Way Crisis*, 11 Pace Envtl. L. Rev. At 493 ("prescription implies an *adverse* user, while use under R.S. 2477 occurs with the government's consent and even encouragement" (emphasis in original)).  Here, we are really more concerned with whether there was "'continued use of the road by the public for such length of time and under such circumstances as to clearly indicate an intention on the part of the public to accept the grant.'"

(continued...)

the existence of a discernable *road* in Salt Creek between Cave Spring and Angel Arch prior to the time in 1952 that the United States Geological Survey took detailed aerial photographs of the area.[97]

Counsel acknowledges that "[a]s a matter of law the lands were reserved on September 12 of 1964,"[98] the date that President Johnson signed the bill creating Canyonlands National Park—thereby terminating the opportunity to accept the R.S. 2477 grant within the Park's boundaries by public use or otherwise. At a minimum, then, to prevail the plaintiffs must prove continuous public use of their claimed Salt Creek right-of-way as a public thoroughfare for the ten years preceding that date—a period commencing no later than *September 12, 1954*.

Four-wheel-drive vehicles (and early Jeeps in particular) introduced scenic tourism to Salt Creek Canyon in the 1950s and brought an increasing number of visitors to the canyon to see features such as Angel Arch in the early 1960s. But by September of 1954, scenic tourism in Salt

---

[96](...continued)
*SUWA*, 425 F.3d at 781 (quoting *Lindsay Land & Live Stock*, 75 Utah at 389, 285 P. at 648).
    In any event, *Okelberry* emphasizes that its newly articulated "interruption" standard "does not change the burden of the party claiming dedication. For a highway to be deemed dedicated to the public, the party claiming dedication must establish by clear and convincing evidence that the road at issue was continuously used as a public thoroughfare for a period of ten years . . . ." 2008 UT 10, at ¶ 15, 179 P.3d at 774.

[97]*See* Findings of Fact, *supra*, at ¶¶ 75-76.

[98](Tr. 10/9/09, at 7:23-24 (Mr. Welch).) The April 9, 1962 withdrawal of public lands in anticipation of the creation of the Park did limit further entry into Canyonlands under the public lands laws, but excepted "leasing under the mineral leasing laws, location and entry of metalliferous minerals under the mining laws, and grazing." 27 Fed. Reg. 4969 (May 26, 1962). *SUWA* suggests that such exceptions distinguish a withdrawal from lands "reserved for public uses" within the meaning of R.S. 2477, such that the "withdrawn" lands remain available for purposes of R.S. 2477's highway right-of-way grant. *See SUWA*, 425 F.3d at 784-86; *but cf. San Juan County*, 503 F.3d at 1170-71.

Creek Canyon was still in its embryonic stage; Angel Arch had been located by the Bates Wilson party only the year before, and was not yet well known;[99] visitors were very few and far between—even with such vehicles at hand—and the sporadic trips along Salt Creek to Angel Arch or other sites that were taken in the early 1950s were still exploratory in nature.[100] Uranium mining activity along the Salt Creek route—as limited as it actually was— was not evident on the ground until at least 1956.[101] The intrepid few who did visit Salt Creek Canyon and Angel Arch in the early 1950s and lived long enough to testify about it in this case did not recall seeing anyone doing any actual mining work in the canyon. Likewise, what little oil exploration activity that actually took place in Salt Creek occurred in 1955 and 1957.[102]

During the 1950s, a visit to Salt Creek Canyon and Angel Arch was an experience marked by pristine solitude.[103] Continuous public use of the plaintiffs' claimed right-of-way *as a*

---

[99]Angel Arch thus did not become the intended destination of the plaintiffs' claimed Salt Creek road until 1953—at the earliest. Actual public awareness of Angel Arch likely did not develop for some time after that. (*See, e.g.*, PX-26 ("Cities of Stone in Utah's Canyonlands," *National Geographic* (May 1962).)

[100]*See* Findings of Fact, *supra*, at ¶¶ 21-38.

[101]*See id.* at ¶¶ 50-58. Several witnesses testified that they saw evidence of bulldozer work (or "blading") along the Salt Creek Canyon route, apparently in or after 1956—about the same time that the trailer appeared at the "Honest John Uranium Mine" site near the Upper Jump (PX-5). *See id.* at ¶¶ 37-38, 41.

[102]*Id.* at ¶¶ 59-60.

[103]Alan "Tug" Wilson recalled taking fifteen to twenty trips through Salt Creek Canyon between 1950 and 1959, maybe more, spending an average of five to ten days in the canyon on each trip. Apart from his own traveling party, Wilson recalled seeing only three other people in the canyon during that time frame, including Kent Frost and "the cowboy that rode into Bates Wilson campsite in 1954." (Tr. 9/22/09, at 161:18-162:12 (testimony of Alan D. Wilson).) Wilson recalled his trip through Salt Creek Canyon in May 1954:

(continued...)

*public thoroughfare*— to reach Angel Arch or anywhere else in Salt Creek Canyon—had not yet begun by September of 1954, and indeed did not commence for some time thereafter.[104] By September of *1964*, it was certainly arguable that the plaintiffs' claimed right-of-way from Cave Spring up Salt Creek Canyon to Angel Arch was in continuous public use as a public thoroughfare, primarily for the purpose of scenic tourism by the growing number of visitors to the Canyonlands area, and for other uses as well. By then, the path of the road had arguably become discernable on the ground as it traversed the Salt Creek stream bed—at least to the extent that the tracks were not washed away by the recurring flood events that are typical of Salt Creek.[105] But given the evidence presented at trial, and this court's findings based on that

---

[103](...continued)
The only encounter we had on that trip would have been the one cowboy when we were camped at what's now known as the Old Bates Wilson campsite, who rode into our camp early one morning. I asked him if he wanted a cup of coffee. Said he never turned it down. He got off his horse, sat on his haunches, had a sip of our boy scout coffee, got back on his horse, and never said a word, and rode away.

(*Id.* at 141:1-11.)

[104]*Id.* at ¶¶ 32-33, 39-40, 43-49. In contrast, in *Sullivan v. Condas*, 76 Utah 585, 290 P. 954, 957 (1930), there was "ample and satisfactory evidence to show that as early as 1873 the roadway extended up and down the canyon . . . while such lands were a part of the public domain," and "was traveled and used by the public generally as occasion required in going up and down the canyon."

[105]It is likely that most visitors' existing memories of "four-wheeling" their way up Salt Creek Canyon to the immediate vicinity to Angel Arch relate to trips taken after the Park was created in September of 1964 and before 1998, when the road was closed to vehicle access. For example, Alan "Tug" Wilson took his first trip by Jeep all the way to Angel Arch with his father and others in 1971. (Tr. 9/22/09, at 162:13-163:13.); *see also* Tr. 9/14/09, at 86:7-87:9 (testimony of John Harja) (recounting his first trip to Angel Arch in 1973 or 1974); Tr. 10/9/09, at 25:4-19 (Mr. Welch); DX-201, at 28 (noting in 1995 the "peak use of" the Salt Creek road by "60 to 70 vehicles per day which now occurs during the spring").)
The frequent use of the plaintiffs' claimed Salt Creek road for thirty-four years after

(continued...)

-78-

evidence, the same cannot be said for the ten years preceding September 12, 1964, and this court must conclude that the plaintiffs have failed to prove by clear and convincing evidence the requisite ten years of continuous public use of their claimed R.S. 2477 right-of-way as a public thoroughfare.[106]

In the context of the Salt Creek route to Angel Arch and in the face of the creation of Canyonlands National Park in September of 1964, the process of public acceptance by public use of the R.S. 2477 right-of-way grant simply ran out of time.

**CONCLUSION**

Without question, the Park Service's view of the efficacy of public motor vehicle access

---

[105](...continued)
September of 1964 could be thought of as "continuous public use," but cannot be taken into account to establish the plaintiffs' claimed R.S. 2477 right-of-way because of the language of R.S. 2477 itself.

[106]Plaintiffs' counsel contends that the applicable standard of proof is "preponderance of the evidence," citing *SUWA*, 425 F.3d at 750. (*See* Joint Reply Trial Brief of San Juan County and the State of Utah, filed September 9, 2009 (dkt. no. 127) ("In *SUWA v. BLM*, the Tenth Circuit did not expressly adopt but referred to the burden as being upon "a preponderance of the evidence standard.") The reference in *SUWA* to the preponderance standard must be considered in the context of that case—an action by a citizens' group seeking declaratory and injunctive relief against the defendant counties for civil trespass on lands managed by the BLM. *See SUWA*, 425 F.3d at 742-49. Here, San Juan County and the State of Utah seek to quiet title to their claimed R.S. 2477 right-of-way *as against the United States*, and *SUWA* borrowed the applicable Utah law to guide that determination—which this court has held includes the Utah clear and convincing evidence standard. *See also Watt v. Western Nuclear, Inc.*, 462 U.S. at 59 (stating that "the established rule [is] that land grants are construed favorably to the Government, that nothing passes except what is conveyed in clear language, and that *if there are doubts they are resolved for the Government, not against it*." (emphasis added) (quoting *United States v. Union Pacific R.R. Co.*, 353 U.S. 112, 116 (1957))).
Yet even under the more relaxed preponderance of the evidence standard, the evidence in this record fails to show that it was more likely than not that there was continuous public use of the claimed Salt Creek road as a public thoroughfare for any ten-year period prior to September of 1964.

to Salt Creek Canyon beyond Peekaboo Spring to Angel Arch has changed over the years since Canyonlands National Park was created in 1964. In 2004, the Park Service struck a new balance between considerations of public access and enjoyment of the Park's amazing natural and historical scenery and the conservation of those same resources—a balance very different from that of 1965, or 1989, or even 1995—and it did so as a matter of *policy*, given the statutory mandates which the agency must satisfy.

Reasonable minds can and do differ concerning the wisdom of the particular balance that was struck by the Park Service in deciding to close Salt Creek Canyon to motor vehicle access above Peekaboo Spring by final rule in 2004, or even to limit motor vehicle access as the agency did in 1995.[107] Those differences led to litigation of the question—*as a policy question*, considered in light of the pertinent statutory mandates— in prior proceedings conducted in this court before Judge Kimball.[108] As events transpired, the policy question was litigated by competing interest groups, without the active participation of either San Juan County or the State of Utah. *See Southern Utah Wilderness Alliance v. Dabney*, 7 F. Supp. 2d 1205, 1212 (D. Utah 1998), *rev'd and remanded*, 222 F.3d 819 (10th Cir. 2000). That litigation ultimately led to a final judgment concluding that the Park Service's "Final Rule, which prohibits motor vehicle use in Salt Creek Canyon above Peekaboo campsite, is based upon a permissible construction of the

---

[107]*See, e.g.*, Joe Bauman, "Roads Issue Becomes Even More Tangled," *Deseret News* (Sept. 16, 2005); Brief of Amici Curiae Southern Utah Wilderness Alliance, et al., filed September 10, 2009 (dkt. no. 128), *passim*; Lindsey Kate Shaw, *Comment: Land Use Planning at the National Parks: Canyonlands National Park and Off-Road Vehicles*, 68 U. Colo. L. Rev. 795 (1997).

[108]*Southern Utah Wilderness Alliance v. Dabney*, Civil No. 2:95-CV-0559DAK (D. Utah, filed June 22, 1995).

Organic Act and Enabling Act and is supported by the Administrative Record." *Southern Utah Wilderness Alliance v. Dabney*, 387 F. Supp. 2d 1178, 1199 (D. Utah 2005).

The policy question having thus been decided, San Juan County and the State of Utah opted in this case to try to force the issue of motor vehicle access to Angel Arch as a matter of legal right under R.S. 2477. *See San Juan County*, 503 F.3d at 1168. Because of the failure of the plaintiffs' proof at trial, that effort has now come to naught. For purposes of R.S. 2477, at least absent proof of continuous public use as a public thoroughfare for the requisite amount of time, a jeep trail on a creek bed with its shifting sands and intermittent floods is a by-way, but not a highway.

For the reasons explained in some detail above,

**IT IS ORDERED** that based upon the foregoing Findings of Fact and Memorandum Opinion, *see* Fed. R. Civ. P. 52(a)(1), judgment shall be entered in favor of the defendants, namely the United States of America, the Department of the Interior, and the National Park Service, and against the plaintiffs, namely San Juan County and the State of Utah; that this action shall be dismissed on the merits; and that the defendants shall recover their costs of action from the plaintiffs. The Clerk of the Court shall enter Judgment consistent with this Order forthwith, *see* Fed. R. Civ. P. 58(a).

DATED this 27th day of May, 2011.

BY THE COURT:

BRUCE S. JENKINS
United States Senior District Judge